Nos. 09-50187, 09-50209

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

———————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

TAANSEN FAIRMONT SUMERU;
JEROME HAROLD HALL,

Defendants-Appellants.

———————————————

Appeal from the United States District Court
for the Central District of California
Honorable S. James Otero, District Judge Presiding

APPELLANTS' JOINT OPENING BRIEF

BENJAMIN L. COLEMAN
COLEMAN & BALOGH LLP
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: (619) 794-0420

Attorneys for Mr. Sumeru

GRETCHEN FUSILIER
ATTORNEY AT LAW
P.O. Box 305
Carlsbad, California  92018
Telephone: (760) 728-5958

Attorney for Mr. Hall

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BAIL STATUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.     THE SECURITIES FRAUD CONVICTIONS SHOULD BE
       REVERSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11

       A.    Introduction And Standards Of Review . . . . . . . . . . . . . . .    12

       B.    Judgments Of Acquittal Should Have Been Entered . . . . . .    12

       C.    The District Court Committed Structural Error By
             Instructing The Jurors That The Charged CDs Were
             "Securities." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

II.    THE WIRE FRAUD CONVICTIONS SHOULD BE REVERSED
       BECAUSE THE GOVERNMENT PROCEEDED ON A LEGALLY
       INVALID CONCEALMENT OR OMISSION THEORY. . . . . . . 29

       A.    Introduction And Standards Of Review . . . . . . . . . . . . . . .    29

       B.    The Wire Fraud Convictions Should Be Reversed  Because

i

The Government Proceeded On A Legally Invalid
Concealment Or Omission Theory . . . . . . . . . . . . . . . . . . . . . . 30

III.   REVERSIBLE ERROR IN MISSTATING THE LAW  IN GIVING
THE "DELIBERATE AVOIDANCE" JURY INSTRUCTION AND
BY GIVING THE "DELIBERATE AVOIDANCE" INSTRUCTION
IN THE ABSENCE OF THE EVIDENTIARY PREDICATE.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

A.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

B.   The Court's Oral Replacement of *"high possibility"* for *"high
probability"* Detrimentally Affected The Jury's Deliberations.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

C.   The Deliberate Avoidance Jury Instruction Was Unsupported
by the Evidence of The Case and Giving It Constituted
Reversible Error  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

IV.   THE EVIDENCE WAS INSUFFICIENT TO SUPPORT HALL'S
SECURITIES FRAUD AND WIRE FRAUD CONVICTIONS.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

A.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

B.   Because the Certificates of Deposit Were Not Securities
the Securities Fraud Conviction Was Based on Insufficient
Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

C.   If The Certificates of Deposits Are Deemed Securities and
Subject to the Securities Laws of the United States, the
Evidence Remains Insufficient to Find that HALL Had the
Requisite Fraudulent Knowledge and Intent to Sustain His
Securities Fraud and Wire Fraud Conviction . . . . . . . . . . . . 45

1. Facts Relevant to HALL's Activities Associated With
SATTVA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

2. No Evidence Supports a Finding That HALL Knew of Fraud Associated With FIBG and its Sub-Banks or Harbored a Fraudulent Intent to Defraud the Investors . . . 50

3. The Representation of High Returns Is Insufficient to Conclude that HALL Intended to Defraud Depositors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

4. HALL Was Required to Follow the Rules Implemented by Van Brink for FIBG in the Daily Operation of SATTVA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

D. There is Insufficient Evidence to Sustain HALL's Conviction of Wire Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

V. MR. SUMERU'S MONEY LAUNDERING CONSPIRACY CONVICTION SHOULD BE REVERSED . . . . . . . . . . . . . . . . . . . 59

A. Introduction And Standards Of Review . . . . . . . . . . . . . . . 59

B. Because The Government Did Not Establish That Mr. Sumeru Agreed To Launder The *Profits* Of Securities And Wire Fraud, There Was Insufficient Evidence To Convict For The Money Laundering Conspiracy; Relatedly, The Jury Was Not Properly Instructed As To This Required Showing
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

C. The Money Laundering Conviction Must Be Reversed Because The Underlying Securities And Wire Fraud Convictions Are Defective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

D. The District Court Committed Plain Error By Failing To Instruct That Mr. Sumeru Must Have The Requisite Intent To Commit Money Laundering, And By Giving A General "Knowingly" Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

VI. MR. SUMERU'S CONVICTIONS FOR FAILURE TO FILE

TAX RETURNS SHOULD BE REVERSED . . . . . . . . . . . . . . . . . 72

    A.    Introduction And Standard Of Review . . . . . . . . . . . . . . . . . . 73

    B.    The Tax Instructions Were Plainly Erroneous . . . . . . . . . . . 73

    C.    Reversal Is Required . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

VII.    REVERSIBLE ERROR IN DENYING HALL'S SEVERANCE
     MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

    A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

    B.    HALL Was Unduly Prejudiced by the Joint Trial . . . . . . . . 76

    C.    The Prejudice Suffered By HALL Was Not Cured By Jury
        Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

CERTIFICATE OF RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . 84

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . 85

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

iv

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Calif. Architectural Building Prod., Inc. v. Franciscan Ceramics, Inc.*,
    818 F.2d 1466 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Cheek v. United States*,
    498 U.S. 192 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Dubach v. Weitzel*,
    135 F.3d 590 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Glasser v. United States*,
    315 U.S. 60 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Great Western Bank & Trust v. Kotz*,
    532 F.2d 1252 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Griffin v. United States*,
    502 U.S. 46 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Guy v. City of San Diego*,
    2010 U.S. App. LEXIS 12405 (9th Cir. June 17, 2010) . . . . . . . . . . 54

*In re Winship*,
    397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 82

*Jackson v. Virginia*,
    443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Landreth Timber Co. v. Landreth*,
    471 U.S. 681 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 26

*Marine Bank v. Weaver*,
      455 U.S. 551 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . 15-17,18,  19, 27

*Morrison v. National Australia Bank Ltd.*,
      130 S. Ct. 2869 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-24

*Pereira v. United States*,
      347 U.S. 1 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Quock Ting v. United States*,
      140 U.S. 417 (1891) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*R.J. Wolf v. Banco Nacional de Mexico*,
      739 F.2d 1458 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 17-19

*Reves v. Ernst & Young*,
      494 U.S. 56 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

*Riedel v. Bancam*,
      792 F.2d 587 (6th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rose v. Clark*,
      478 U.S. 570 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*SEC v. Rubera*,
      350 F.3d 1084 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Sullivan v. Louisiana*,
      508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Tafflin v. Levitt*,
      865 F.2d 595 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United States v. Abushi*,
      682 F.2d 1289 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 77

vi

*United States v. Alferahin,*
   433 F.3d 1148 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 75

*United States v. Alghazouli,*
   517 F.3d 1179 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*United States v. Allen,*
   88 F.3d 765 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Angwin,*
   271 F.3d 786 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v. Bala,*
   489 F.3d 334 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*United States v. Barona,*
   56 F.3d 1087 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Bear,*
   439 F.3d 565 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 75

*United States v. Beckett,*
   724 F.2d 855 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Benny,*
   786 F.2d 1410 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Brown,*
   578 F.2d 1280 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 50

*United States v. Burt,*
   143 F.3d 1215 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 72, 75, 76

*United States v. Camacho,*
   528 F.2d 464 (9th Cir),
   *cert. denied*, 429 U.S. 995,(1976) . . . . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Cusino*,
    694 F.2d 185 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Dadanian,*
    818 F.2d 1443, 1446 (9th Cir. 1987),
    modified, 856 F.2d 1391 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Deeb*,
    175 F.3d 1163 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Desantis*,
    134 F.3d 760 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Diaz-Cardenas*,
    351 F.3d 404 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Dior*,
    671 F.2d 351 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Dowling*,
    739 F.2d 1445, 1449 (9th Cir. 1984),
    *rev'd on other grounds*, 473 U.S. 207 (1985) . . . . . . . . . . . . . . . . . 32

*United States v. Escalante*,
    637 F.2d 1197 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 79

*United States v. Estacio*,
    64 F.3d 477 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*United States v. Ferrarini*,
    219 F.3d 145 (2nd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 42

*United States v. Freeman*,
    498 F.3d 8937 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Fuchs*,
    218 F.3d 957 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 34, 37, 71

*United States v. Garzon*,
    688 F.2d 607 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39-41

*United States v. Gaudin*,
    515 U.S. 506 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Hall*,
    Nos. 06-50356, 06-50381,
    2008 WL 748942 (9th Cir. Mar. 19, 2008) . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Hamilton*,
    391 F.3d 1066 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 29

*United States v. Hanley*,
    190 F.3d 1017 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*United States v. Hoffman*,
    918 F.2d 44 (6th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. James*,
    987 F.2d 648 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Jewell*,
    532 F.2d 697 (9th Cir.)(en banc),
    *cert. denied*, 426 U.S. 951 (1976). . . . . . . . . . . . . . . . . . . . 39, 40, 42

*United States v. Johnson*,
    718 F.2d 1317 (5th Cir. 1983) (*en banc*) . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Joseph*,
    542 F.3d 13 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Kessi*,
    868 F.2d 1097 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Kilbride*,
    584 F.3d 1240 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

ix

*United States v. Laurienti,*
    __ F.3d __, 2010 WL 2473573 (9th Cir. June 16, 2010) . . 30, 32, 33

*United States v. Lothian,*
    976 F.2d 1257 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 58

*United States v. Manion,*
    339 F.3d 1153 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 58

*United States v. Martinez,*
    54 F.3d 1040 (2nd Cir. 1995, as amended May 17, 1995) . . . . . . . . 46

*United States v. Moreland,*
    604 F.3d 1058 (9th Cir. 2010) . . . . . . . . . . . . . . . . . 35, 43, 60, 67, 71

*United States v. Munoz,*
    233 F.3d. 1117 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Nicholson,*
    677 F.2d 706 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*United States v. Olano,*
    507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*United States v. Orduno-Aguilera,*
    183 F.3d 1138 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Owens,*
    335 F.3d 993 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Perez,*
    116 F.3d 840 (9th Cir. 1997) (*en banc*) . . . . . . . . . . . . . . . . . . . 71, 75

*United States v. Peters,*
    277 F.3d 963 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Plache*,
913 F.2d 1375 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Polizzi*,
801 F.2d 1543 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 81

*United States v. Powell*,
955 F.2d 1206 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*United States v. Price*,
623 F.2d 587 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Prince*,
214 F.3d 740 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Rogers*,
9 F.3d 1025 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Romo-Romo*,
246 F.3d 1272 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Sanchez-Cervantes*,
282 F.3d 664 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Sanchez-Robles*,
927 F.2d 1070 (9th 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41-43

*United States v. Santos*,
128 S. Ct. 2020 (2008) . . . . . . . . . . . . . . . . . . . . . . . . 62, 64, 66, 67

*United States v. Savage*,
67 F.3d 1435 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*United States v. Schaflander*,
719 F.2d 1024 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Shipsey*,
     363 F.3d 962 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Smith*,
     735 F.2d 1196 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Soto*,
     47 F.3d 546 (2nd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Stein*,
     37 F.3d 1407 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 71

*United States v. Sullivan*,
     522 F.3d 967 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Tarallo*,
     380 F.3d 1174 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Tarnopol*,
     561 F.2d 466 (3rd Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Thomas*,
     459 F.2d 1172 (D.C. Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Van Alstyne*,
     584 F.3d 803 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . 60, 62-64, 66, 67

*United States v. Warren*,
     984 F.2d 325 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Voohries-Larson v. Cessna Aircraft Co.*,
     241 F.3d 707 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*West v. Multibanco Comermex, S.A.*,
     807 F.2d 820 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Yates v. United States*,
     354 U.S. 298 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Zafiro v. United States*,
  506 U.S. 534 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

## CONSTITUTIONAL PROVISIONS

U.S. Const. Amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## STATUTES

15 U.S.C. § 77b(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 26

15 U.S.C. § 77q(a) . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 5, 12-14, 21, 23-25

15 U.S.C. § 77x . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5

15 U.S.C. § 78 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. §1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 29, 57

18 U.S.C. § 1955 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

18 U.S.C. § 1956 . . . . . . . . . . . . . . . . . . . . . . 1, 4, 5, 59, 60, 62, 63, 68, 69

18 U.S.C. § 2314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

18 U.S.C. § 3742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

26 U.S.C. § 7203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 5, 73, 74

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Grenada Offshore Banking Act and International Companies Act,
    §4(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Grenada Offshore Banking Act and International Companies Act,
    §5(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## RULES

Fed. R. App. P. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. of Crim. P.,  Rule 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

## NINTH CIRCUIT MODEL JURY INSTRUCTIONS

Ninth Cir. Model Crim. Jury Instr. 5.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Ninth Cir. Model Jury Instr. 8.121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Ninth Cir. Model Jury Instr. 8.123. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | U.S.C.A. Nos. 09-50187, 09-50209 |
| | ) | U.S.D.C. No. CR 05-0121-SJO |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TAANSEN FAIRMONT SUMERU; | ) | |
| JEROME HAROLD HALL | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| _____ | ) | |

## **STATEMENT OF JURISDICTION**

Appellants, Taansen Fairmont Sumeru and Jerome Harold Hall,

appeal their convictions and sentence for securities fraud, 15 U.S.C. §§

77q(a), 77x, wire fraud, 18 U.S.C. § 1343, money laundering conspiracy, 18

U.S.C. § 1956(h), and failure to file tax returns, 26 U.S.C. § 7203. The

district court asserted jurisdiction pursuant to 18 U.S.C. § 3231 and entered

judgment on March 23, 2009. CR 357, 358; JAER 62-71.[1] Mr. Hall's

notice of appeal was timely filed on April 1, 2009, CR 333; JAER 60, and

---

[1] "CR" refers to the Clerk's Record. "JAER" refers to the Joint Appellants' Excerpts of Record. "RT" refers to the Reporters Transcript of Proceedings.

1

Mr. Sumeru's notice of appeal was filed on April 2, 2001, CR 334, JAER

59, both within the 10-day period set out in Fed. R. App. P. 4(b).  This

Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## BAIL STATUS

Mr. Sumeru has completed the custodial portion of his

sentence and is currently on supervised release.  Mr. Hall is in custody with

a projected release date of April 12, 2003.

## STATEMENT OF THE ISSUES

1. There are two related issues with respect to appellants'

convictions for securities fraud, in violation of 15 U.S.C. § 77q(a).  First,

should the district court have entered judgments of acquittal because the

government introduced no evidence that the conventional certificates of

deposit ("CDs") charged were "securities," and evidence adduced indicated

they were not "securities," as that term is defined under federal securities

law?  Second, did the district court commit structural error by essentially

directing a verdict on the "securities" element?

2. Should appellants' wire fraud convictions be reversed

because they did not have a fiduciary duty to the CD purchasers who were

the alleged victims of the fraud, nor were the jurors instructed that they had

2

to find such a fiduciary duty, and therefore the government relied on a legally invalid concealment theory of fraud?

3.   Should the securities fraud and wire fraud convictions be reversed because the district court  misstated the  "deliberate avoidance" jury instruction by orally stating that "the defendant was aware of a *high possibility* that the representations made about Sattva Bank were false and he deliberately avoided learning the truth" when the legally accepted instruction speaks to *"a high probability*?"   Secondly, should the convictions be reversed because the deliberate avoidance jury instruction was unsupported by the evidence  of the case as required by solid legal precedent  and giving it, therefore, constituted harmful reversible error?

4.   First, should Mr. Hall's securities and wire fraud convictions  be reversed because  they were based on certificates of deposits which the evidence reflects were not "securities?"  Secondly, should Mr. Hall's securities and wire fraud convictions be reversed because the evidence does not support a finding that he harbored the requisite culpable knowledge and intent?

5.   There are three issues with respect to Mr. Sumeru's conviction for conspiracy to launder money, in violation of 18 U.S.C.

§1956(h). First, should that conviction be reversed because the government failed to show that Mr. Sumeru agreed to launder *profits* of the alleged securities and wire fraud (as compared to merely transferring receipts thereof)? Relatedly, is reversal required because the district court failed to give an appropriate jury instruction that Mr. Sumeru had to agree to launder *profits*, rather than simply agreeing to transfer receipts, from securities and wire fraud? Second, should that conviction be reversed because of the invalidity of the underlying securities and wire fraud convictions? Third, did the district court plainly err by failing to instruct the jury that Mr. Sumeru was required to know that the laundered funds were derived from securities and wire fraud, and by giving a general "knowingly" instruction?

6.   Should Mr. Sumeru's convictions for failing to file a tax return, 26 U.S.C. §7203, be reversed because the district court plainly erred in failing to instruct the jury that the offense element of "willfulness" requires a person to act with knowledge of a known legal duty, and with the intent to violate that duty?

7.   Should Mr. Hall's convictions be reversed because the denial of his motion to sever the trials resulted in undue prejudice to Mr. Hall that was not cured by an appropriate jury instruction?

4

## **STATEMENT OF THE CASE**

On February 9, 2005, a federal grand jury in the Central District of California returned a twenty-count indictment against the appellants. Counts One through Eight alleged securities fraud (15 U.S.C. §§ 77q(a), 77x and 18 U.S.C. § 2). Counts Nine through Seventeen alleged wire fraud (18 U.S.C. §§ 1343 and 2). Mr. Sumeru was additionally charged in Count Eighteen with engaging in a money laundering conspiracy (18 U.S.C. § 1956(h)); and, in Counts Nineteen through Twenty, with failure to file income tax returns (26 U.S.C. § 7203). JAER 36-58; CR 1.

Both appellants proceeded to jury trial in 2006 and were convicted. CR 117-18. This Court, however, reversed their convictions in an unpublished opinion. *See United States v. Hall*, Nos. 06-50356, 06-50381, 2008 WL 748942 (9th Cir. Mar. 19, 2008). This Court held that the judge's conduct throughout the trial was improper, and therefore this Court remanded for a new trial before a different district judge.

On September 8, 2008, appellants again proceeded to a jury trial, this time before a different district judge. On September 16, 2008, they were both convicted on counts 1-7, 9-12, and 14-16. Mr. Sumeru was also convicted on Counts 18-20. CR 295, 299, 300. On March 23, 2009, both

appellants were sentenced to 63 months of imprisonment, three years of

supervised release, and $518,000 in restitution.  CR 335, 342.

## STATEMENT OF FACTS

The relevant facts are set forth in more detail as they relate to

each specific claim made in the Argument section of this brief.  In general,

the indictment alleged that First International Bank of Grenada ("FIBG")

was a foreign bank incorporated and licensed in Grenada in October 1997.

FIBG claimed to have assets valued at more than $60 billion and offered

various banking products, including CDs with high interest rates.  JAER 37.

Beginning in February 1999, FIBG provided initial funding for

"affiliated correspondent" or "sub" banks in Grenada to operate under the

"umbrella" of FIBG.  The primary purpose of these sub-banks was to solicit

customers to purchase high yield CDs issued either by FIBG or under the

sub-bank's own name.  FIBG offered CDs at high rates to the sub-banks,

which then sold them to customers at lower interest rates.  The sub-banks

were to keep the "spread" between the interest rates as profit.  JAER 37-38.

Mr. Sumeru and Mr. Hall held themselves out to be co-founders

and directors of Sattva Investment Bank, Ltd. ("Sattva"), which was a

foreign bank incorporated and licensed in Grenada that operated as a sub-

bank for FIBG.  JAER 36-37.  Although FIBG was licensed in Grenada, the

government asserted that it was nothing more than a Ponzi scheme, and the

government further maintained that Mr. Sumeru and Mr. Hall knowingly

participated in that fraud in their operation of Sattva as a sub-bank.

Specifically, the government maintained that Mr. Sumeru and

Mr. Hall made a variety of false statements and material omissions that

convinced customers to purchase the high yield CDs that it offered.  Among

other things, the government alleged that appellants made the following

misrepresentations:

> Appellants misrepresented their educational background and
> their experience and expertise in finance to customers;
>
> Appellants submitted an application to the Ministry of Finance
> of Grenada that contained misleading representations, including
> that Mr. Sumeru had accounts at FIBG exceeding $1.5 million
> and that Sattva would invest in the world markets on behalf of
> its clients;
>
> Appellants lured clients with promotional materials that falsely
> represented that Sattva could guarantee interest rates as high as
> 200% per year;
>
> Appellants claimed that Sattva was insured by the International
> Deposit Reinsurance Corporation ("IDIC"), which was a fully
> bonded institution with vast assets to fully guarantee the clients'
> deposits, when in truth IDIC was a sham entity;
>
> Appellants maintained that Sattva had billions in assets under

management and large cash reserves, when the only assets it had were the funds obtained from its clients;

Appellants failed to disclose their lack of success with high yield investments and their lack of control over funds provided to Sattva;

Appellants falsely claimed that Sattva's clientele consisted mainly of tax haven charitable organizations involved in humanitarian projects;

Appellants misrepresented that Sattva provided debit cards that were recognizable at most automatic teller machines and would allow depositors access to their money at any time.

JAER 40-49.  In total, the government claimed that between June 1999 and May 2000, individuals deposited more than $5 million with Sattva and that appellants diverted a portion of these funds to their own personal use.

JAER 47-48.  In August of 2000, the Government of Grenada placed FIBG into receivership.  JAER 37.

## **<u>SUMMARY OF ARGUMENT</u>**

This joint brief raises seven issues.  Issues 1-3 are raised by both appellants.  Issue 4 is raised by Mr. Hall.  Issues 5-6 are raised by Mr. Sumeru.  Issue 7 is raised by Mr. Hall.  The arguments are as follows.

**First**, appellants' securities fraud convictions should be reversed because the government failed to prove that the CDs that they sold were

"securities," and the evidence introduced indicated those CDs were not "securities," as that term is defined under federal securities law. Both Supreme Court and Ninth Circuit precedent dictate that CDs of a foreign bank, regulated by foreign banking laws, do not constitute "securities" under federal securities law. As a result, judgments of acquittal should have been entered as to both appellants on the securities fraud counts. Alternatively, the district court committed structural error when it essentially directed a verdict on the "securities" element of the offense.

**Second**, the government proceeded on a concealment or omission theory of fraud. In other words, the government argued that appellants were guilty of fraud because they failed to disclose material facts to the purchasers of the CDs. This Court has held that a defendant can only be held liable for fraud under a concealment or omission theory if he had a fiduciary or trust relationship with the victim of the fraud. In this case, the government offered no evidence that appellants had such a fiduciary relationship, nor did they, and the jury was not instructed that it had to find such a trust relationship. Because the jury could have convicted on this legally invalid theory of liability, this Court must reverse.

**Third**, the district court judge misstated the law in instructing

9

the jury on deliberate avoidance by stating determining if "the defendant was aware of a *high possibility* that the representations made about Sattva Bank were false and he deliberately avoided learning the truth" when the legally accepted instruction speaks to *"a high probability*?"  The deliberate avoidance instruction is meant to be used sparingly to avoid convicting appellants on a negligence theory - that he should have known.  To protect against such a conviction, legal precedent allows this instruction only where the proper evidentiary precedent was introduced in trial; that did not occur here.

**Fourth,** Mr. Hall's securities and wire fraud convictions were based on certificates of deposits which the evidence does not establish were "securities" under the securities laws of the United States.  The evidence does not support a finding that Mr. Hall harbored the requisite culpable knowledge and intent to sustain his conviction.

**Fifth,** Mr. Sumeru's conviction for conspiring to commit money laundering should be reversed for multiple reasons.  As an initial matter, because the underlying securities and wire fraud convictions are invalid, the money laundering conviction must be reversed.  Additionally, recent Supreme Court and Ninth Circuit precedent require the government to prove

that a defendant laundered the profits (rather than merely transferring receipts) of a criminal scheme, and the government failed to make this showing, and the jury was not instructed that it had to make this finding. The district court also plainly erred by failing to instruct the jury that Mr. Sumeru was required to know that the laundered funds were derived from securities and wire fraud, and by giving a general "knowingly" instruction.

**Sixth,** Mr. Sumeru's convictions for failing to file tax returns should be reversed because the district court plainly erred by failing to instruct the jury that the offense element of "willfulness" requires a person to act with knowledge of a known legal duty, and with the intent to violate that duty. Given that the evidence that Mr. Sumeru possessed this requisite mental state was not overwhelming, reversal is required, even under the plain error standard.

**Seventh,** Mr. Hall's motion to sever the trials resulted in undue prejudice to Mr. Hall that was not cured by an appropriate jury instruction.

## ARGUMENT

## I.

## THE SECURITIES FRAUD CONVICTIONS SHOULD BE REVERSED.

### A.  Introduction And Standards Of Review

Appellants were convicted of seven counts of securities fraud (Counts 1-7), in violation of 15 U.S.C. §77q(a).  JAER 50.  Appellants raise two issues as to these convictions.  First, a necessary element of securities fraud under §77q(a) is that the defendant commit fraud with respect to the offer or sale of "securities," a term defined by statute.  The government offered no evidence that the financial instruments charged -- conventional CDs issued by a Grenadian bank -- were "securities."  Moreover, that is a showing the government could not make, because the CDs were not, as a matter of law, "securities."  Because appellants moved for judgment of acquittal, JAER 7-9, this issue is reviewed *de novo*.  *See, e.g.*, *United States v. Orduno-Aguilera*, 183 F.3d 1138, 1139-40 (9th Cir. 1999).

Second, the district court erred when it essentially instructed the jury that the CDs charged in the indictment were "securities."  Although appellants did not object to that instruction, thereby triggering plain error review, the error was structural, and thus reversal is required.  *See, e.g.*, *United States v. Hamilton*, 391 F.3d 1066, 1071 (9th Cir. 2004).

### B.  Judgments Of Acquittal Should Have Been Entered

Section 77q(a) prohibits various types of fraudulent activity "in

12

the offer or sale of any securities . . . ."  Consistent with the statutory

language, this Court has held that an element of a §77q(a) offense is "that

the object sold or offered [was], in fact, a security," as that term is "defined

in the Act."  *United States v. Brown*, 578 F.2d 1280, 1284-85 (9th Cir.

1978); *see also SEC v. Rubera*, 350 F.3d 1084, 1089 (9th Cir. 2003) ("[t]o

establish a claim for violation of federal securities law, it is necessary to

show that the violation involved a 'security' as defined by the Securities

Acts").

In the indictment, the government charged that the CDs issued

by First International Bank of Grenada ("FIBG"), and sold by Sattva Bank,

were the securities at the heart of the fraud.  *See, e.g.*, JAER 36-49.  The

indictment also tacitly acknowledged that showing that the CDs were

"securities" was an element that the government must prove at trial.

Specifically, paragraph thirty-nine of the indictment claimed: "As offered by

the defendants to investors, Sattva CDs[2] identified in paragraph 20 above

were securities within the meaning of the federal securities law."  JAER 49.

Nevertheless, the government introduced no evidence at trial to establish

---

[2]     Although the indictment at times refers to the CDs as "Sattva CDs,"
this was shorthand for the CDs issued by FIBG and sold by Sattva.

13

that the CDs were "securities" within the meaning of §77q(a).

"Without any evidence on [whether the CDs qualified as securities], no rational jury could have found beyond a reasonable doubt that [appellants committed securities fraud]." *United States v. James*, 987 F.2d 648, 650 (9th Cir. 1993). Accordingly, on Counts 1-7, the district court should have entered a "judgment of acquittal . . . due to lack of evidence on an essential element of the crime charged." *United States v. Dior*, 671 F.2d 351, 358 (9th Cir. 1982) (government failed to introduce evidence establishing element that goods involved were worth at least $5,000); *see also United States v. Allen*, 88 F.3d 765, 768-69 (9th Cir. 1996) (government failed to introduce evidence establishing element that bank was FDIC insured).

The government's failure to introduce evidence establishing that the CDs were "securities" compels judgment of acquittal. But it is worth noting that this was not solely an inadvertent failure to adduce evidence. Instead, the record indicates that the CDs were not "securities," as that term is defined by statute. This is so because: (1) conventional CDs, issued by comprehensively regulated banks, are not "securities" within the ambit of United States securities laws; and (2) the same is true for foreign issued and

14

sold financial instruments.

"Security" is defined in 15 U.S.C. §77b(a)(1).  Although that definition includes several specific types of financial instruments, Supreme Court opinions "have not been entirely clear on the proper method of analysis for determining when an instrument is a 'security.'"  *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 688 (1985).  The fact-based approach that has emerged has resulted in the Court at times concluding that financial instruments specifically listed in §77b(a)(1) were not "securities," such as some "stocks" and "notes."  *See, e.g.*, *Landreth*, 471 U.S. at 686 ("the fact that instruments bear the label 'stock' is not itself sufficient to invoke the coverage of the [securities] Acts;" instead courts "must also determine whether those instruments possess some of the significant characteristics typically associated with stock") (quotation omitted); *Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990) ("the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts").

Applying this fact-based, what-did-Congress-intend approach, in *Marine Bank v. Weaver*, 455 U.S. 551 (1982), the Court assessed whether a

15

"conventional certificate of deposit"[3] qualified as a "security." For the

following reasons, the Court concluded the answer was no:

> The Court of Appeals also concluded that a certificate of deposit is similar to any other long-term debt obligation commonly found to be a security. In our view, however, there is an important difference between a bank certificate of deposit and other long-term debt obligations. This certificate of deposit was issued by a federally regulated bank which is subject to the *comprehensive set of regulations governing the banking industry*. Deposits in federally regulated banks are protected by the reserve, reporting, and inspection requirements of the federal banking laws; advertising regulating to the interest paid on deposits is also regulated. In addition, deposits are insured by the Federal Deposit Insurance Corporation. Since its formation in 1933, nearly all depositors in failing banks insured by the FDIC have received payment in full, even payment for the portions of their deposits above the amount insured. . . . .

> We see, therefore, important differences between a certificate of deposit purchased from a federally regulated bank and other long-term debt obligations. The Court of Appeals failed to give appropriate weight to the important fact that the purchaser of a certificate of deposit is virtually guaranteed payment in full, whereas the holder of an ordinary long-term debt obligation assumes the risk of the borrower's insolvency. The definition of "security" in the 1934 Act provides that an instrument which seems to fall within the broad sweep of the Act is not to be considered a

---

[3]     Notably, section 77b(a)(1) of Title 15 includes within the definition of "security" a "certificate of deposit for security." As the Court made clear in *Marine Bank*, that is not the same thing as a conventional CD (*i.e.*, where a sum is deposited with a bank and interest is paid at fixed intervals). *See Marine Bank*, 455 U.S. at 557 n.5. This case involves conventional CDs.

> security if the context otherwise requires. *It is unnecessary to subject issuers of bank certificates to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws. We therefore hold that the certificate of deposit purchased by the Weavers is not a security.*

*Id.* at 558-59 (emphasis added).

In short, in *Marine Bank* the Court held "that the existence of a comprehensive regulatory and insurance system governing the issuer removes certificates of deposit issued by [banks] from the general definition of 'securities' contained in the [federal securities acts]." *Tafflin v. Levitt*, 865 F.2d 595, 598-99 (4th Cir. 1989) (holding CDs were not "securities" due to comprehensive state regulation); *see also Reves*, 494 U.S. at 67 ("we examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary"); *Dubach v. Weitzel*, 135 F.3d 590, 592 (8th Cir. 1998) (holding CD not a "security" due to comprehensive state regulation: "[t]o apply federal securities law would 'double-coat' the transaction").

This Court has twice applied *Marine Bank*'s holding to CDs issued by foreign banks. In *R.J. Wolf v. Banco Nacional de Mexico*, 739

17

F.2d 1458, 1462 (9th Cir. 1984), this Court held that because "Mexico abundantly regulates its banks," and thus depositors were protected under Mexican banking laws, "the certificates of deposit [involved in that case] were outside the definition of 'security' and the protection of the federal securities acts."[4] *See also Riedel v. Bancam*, 792 F.2d 587, 593 (6th Cir. 1986) (noting district court's correct application of *Wolf*). Similarly, in *West v. Multibanco Comermex, S.A.*, 807 F.2d 820 (9th Cir. 1987), the plaintiffs complained that Mexican authorities were not enforcing their banking regulations, thus *Wolf* should not apply and the Mexican bank issued CDs should be considered "securities." This Court rejected that argument, applying the act of state doctrine and concluding that the relevant issue is whether there is a comprehensive regulatory structure, not its efficacy. *Id.* at 827; *see also Tafflin*, 865 F.2d at 599 (relying on *West* and rejecting similar claim that Maryland banking laws were ineffectual as applied). In other words, the only relevant question in determining whether a conventional CD issued by a foreign bank is covered by United States

_____

[4]     In *Wolf*, this Court noted that, in *Marine Bank*, the Supreme Court was dealing with the definition of "security" in the Securities Act of 1934, but found that the definitions "are essentially the same," and thus *Marine Bank*'s holding applied. *Wolf*, 739 F.2d at 1461.

18

securities laws is whether the foreign government has "adopted a comprehensive regulatory scheme governing banking operations." *West,* 807 F.2d at 828.

While the government failed to introduce any evidence that the CDs charged were "securities," it actually introduced compelling evidence showing that they were not. Specifically, the government called a Grenadian official, and through him introduced a copy of the Grenada Offshore Banking Act that applied to FIBG and Sattva Bank. *See* JAER 72-94. That Act provides for the comprehensive regulation central to the holdings of *Marine Bank* and *Wolf,* including:

> (1) requiring a company engaged in offshore banking to be incorporated and licensed in Grenada, in accord with Grenada's Offshore Banking Act and International Companies Act, *see* §4(1) & 5(a);

> (2) requiring a company to submit an application "giving the particulars of the offshore banking business . . . it proposes to do from within Grenada" and "provi[ing] such other information . . . as the Minister [of Finance] may require in general or particular cases," *see* §7(1);

> (3) indicating the Minister of Finance may require an investigation of all aspects of a company applying to conduct offshore banking, including "the adequacy of its capital" and "its earning prospects," *see* §8(2);

> (4) indicating the Minister of Finance may deny an offshore

19

banking license if he/she determines "it would be undesirable in the public interest," and "need not give any reason for such refusal," *see* §9(1);

(5) requiring a licensee to have a principal office in Granada, conduct business in "the interest of depositors and the public," maintain capital reserves, make provision to weather losses, and comply with any other regulations imposed by the Minister of Finance, *see* §12;

(6) imposing limitations on business based on the class of license issued, *see* §14;

(7) imposing starting capital and reserve requirements, *see* §16;

(8) imposing capital "reserve fund" requirements, *see* §17;

(9) giving the Minister of Finance broad regulatory and investigatory powers, and requiring the Minister to "examine[] the affairs of each licensee from time to time," and take corrective action, including revoking the license, *see* §§18-21;

(10) restricting dividend payments, *see* §23;

(11) limiting extension of unsecured credit, *see* §26;

(12) imposing confidentiality requirements, *see* §28;

(13) restricting licensees from operating outside Grenada, *see* §29;

(14) requiring a licensee to quarterly report "assets and liabilities" and annually publish its "balance sheet and profit and loss account," the latter of which must be certified by an "approved auditor," §§31-32, 34;

20

(15) authorizing the Minister of Finance to appoint a "suitable person" to examine "the books and affairs of any licensee," *see* §33;

(16) requiring a licensee to have a "policy of insurance with a reputable insurance company against . . . the dishonesty of employees of the licensee . . . in such amount and of such nature as the Registrar may determine to be fit an proper," *see* §44;

(17) providing for director liability, *see* §47;

(18) authorizing the Minister of Finance to make regulations to carry out the purposes of the Act, *see* §49;

(19) applying the provisions of the International Companies Act to all licensees, *see* §51;

(20) indicating three other Grenada Acts "concerned with offshore services," *see* First Schedule;

(21) indicating approved auditors, *see* Third Schedule; and

(22) setting out substantial licensing fees, which insure adequate funds for regulatory activities.  *See* Offshore Services (Fees) Regulations.

JAER 72-94.  Given this comprehensive array of regulations, the only relevant evidence adduced at trial indicated that the CDs charged did not qualify as securities under United States securities law.  This alone compelled granting judgment of acquittal on the securities fraud counts.

Section 77q(a) also did not apply to the CDs charged because

21

that section only encompasses "securities" that are "offered for sale," or sold, in the United States, and the CDs charged were offered for sale, and sold, outside the United States. In *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), foreign plaintiffs brought suit against foreign and domestic defendants under 15 U.S.C. § 78j(b), claiming fraud with respect to the sale of securities traded on foreign exchanges. Section 78j(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Assessing whether the statute covers foreign-issued securities, the Court began its analysis by noting the strong presumption against extraterritorial application of United States laws, absent a clear indication of Congressional intent. *See id.* at 2877-78. Looking first at the statutory language, the Court found it contained "nothing to suggest it applies abroad." *Id.* at 2881-82. As for the larger statutory regime in the Exchange Act, the Court found the

22

focus was on domestic transactions, and found the "same focus on domestic transactions is evident in the Securities Act of 1933." *Id.* at 2885. Finding "no affirmative indication that [the statute] applies extraterritorially," the Court concluded that "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities," are covered by the statute. *Id.* at 2883.

Two additional aspects of the Court's analysis are relevant here. First, the Court rejected the government's arguments that the statute applies if some of the fraudulent conduct occurred in the United States, or if the effects of the fraud are in any way felt in the United States. *See id.* at 2879-81, 2883-84, 2886. Second, the Court concluded that "[t]he probability of incompatibility with the applicable laws of other countries is so obvious that if Congress intended such foreign application it would have addressed the subject of conflicts with foreign laws and procedures." *Id.* at 2885-86.

Thus, *Morrison* reinforces that the CDs charged were not securities, within the ambit of federal securities laws. First, there is nothing in §77q(a) to suggest it applies to foreign transactions. Indeed, unlike many statutes, it refers to interstate commerce, but says nothing about foreign commerce. Second, section 77q(a) is part of the Securities Act of 1933,

23

which *Morrison* recognized focuses on domestic transactions. Third, as already discussed above, the CDs charged in this case were subject to comprehensive regulation under Grenada law, and thus application of United States law would create significant conflict problems. This conflict issue assumes special poignancy here, given that the government alleged, and its financial fraud trial expert asserted, that people purchased the CDs charged to evade United States taxes. *See, e.g.*, JAER 45-46 (claiming appellants solicited clients by telling them Sattva Bank would not provide "reports on the earnings accruing to its clients to governments or tax departments anywhere"). Surely Congress did not intend to extend the protections of the securities laws to those who purchase CDs in foreign countries in an effort to evade paying United States taxes.

Finally, the Court in *Morrison* rejected any sort of domestic "conduct" or "effects" test for assessing the statute's reach, instead relying on the statutory language and focusing on where the "purchase or sale" occurred. Similarly, the language of §77q(a) indicates the focus is on where the "offer or sale" of the securities occurred. Here, the CDs charged were offered and sold in Grenada. Accordingly, they were not "securities" within the ambit of United States securities laws. This also compelled entry of

24

judgments of acquittal on the securities fraud counts.

### C. The District Court Committed Structural Error By Instructing The Jurors That The Charged CDs Were "Securities"

Though the government introduced no evidence that the CDs charged were securities, and though the evidence indicated they were not, the district court effectively told the jurors that the CDs charged were "securities." Thus, even if this Court disagrees with the arguments above, the directed verdict on the "securities" element amounted to structural error, which alone compels reversal of the securities fraud counts.

When instructing the jury on the offense elements for securities fraud, the district court said the following:

> In order for a defendant to be found guilty of those charges, the government must prove each of the following elements beyond a reasonable doubt:
>
> First, the defendant offered or sold *the securities described in the indictment*;
>
> Second, in the offer or sale of *these securities*, the defendant used the United States mail;
>
> Third, in the offer or sale of *these securities*, the defendant knowingly [engaged in the types of fraudulent conduct set out in §77q(a)(1) to (3)];
>
> and;

25

> the defendant acted for the purpose of defrauding buyers of
> *the securities*.

JAER 16 (emphasis added).

The district court never told the jurors that they must find that the CDs charged were securities. Instead, the district court referred to the "securities described in the indictment," and then repeatedly referred to "these securities." There was only one financial instrument described in the indictment: the CDs that the indictment claimed "were securities within the meaning of the federal securities law." JAER 49. By referring back to the indictment in the manner it did, the district court told the jurors that the CDs charged were "securities."[5]

Compounding this error, the district court listed several items that qualify as securities, based on the statutory definition in 15 U.S.C. §77b(a)(1).[6] *See* JAER 17. One of the items the district court listed was a "certificate of deposit for security." Without any clarification -- and there

---

[5]    The indictment was provided to the jury during deliberations. *See* JAER 6.

[6]    After providing this definition of "security," the district court gave the jury the three-part test for determining when an "investment contract" qualifies as a "security." *See* JAER 17. That test has no application for assessing whether a conventional CD is a "security." *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 691-92 (1985).

was none -- jurors undoubtedly assumed that this term encompassed the conventional CDs charged in this case. That assumption was wrong, as the Supreme Court made clear in *Marine Bank*, 455 U.S. at 557 n.5 (explaining that "certificate of deposit for security" only "refers to instruments issued by protective committees in the course of corporate reorganizations"). Thus, even supposing a particularly hardy juror who ignored the district court's instruction that the CDs charged in the indictment were securities, the subsequent definition of security given by the court would convince that juror the CDs charged qualified as securities.

By telling the jurors the CDs charged were securities, the district court directed a verdict on that element. That amounted to structural error. *United States v. Rogers*, 9 F.3d 1025 (2d Cir. 1993) is instructive. There, the defendant was charged with interstate transportation of stolen "securities," in violation of 18 U.S.C. §2314. *See id.* at 1032. *Rogers* held the "district court denied [the defendant] his sixth amendment right to a jury trial on each issue of fact when it decided as a matter of law the [leases at issue] were 'securities,' and so charged the jury." *Id.* at 1032. This amounted to directing a verdict on an element of the offense, which the court held to be structural error that compelled reversal. *See id.* at 1032-33.

27

Also on-point is the Fifth Circuit's *en banc* opinion in *United States v. Johnson*, 718 F.2d 1317 (5th Cir. 1983) (*en banc*). There, the defendant was charged with interstate transportation of "a falsely made security," in violation of 18 U.S.C. §2314. *See id.* at 1318. The Fifth Circuit noted that the issue of whether the gold certificates charged were "securities" was an essential element of the offense, and the district court erred by not so instructing the jurors because "in criminal cases, the court simply may not direct a verdict *on any issue*." *Id.* at 1323 (emphasis added).

Both *Rogers* and *Johnson* are consistent with the Supreme Court's subsequent opinion in *United States v. Gaudin*, 515 U.S. 506 (1995). There, the defendant was charged with making false statements, in violation of 18 U.S.C. §1001. When instructing the jury, the district court acknowledged that materiality of the statements was an element of the offense charged, but nevertheless instructed the jurors that "the statements charged in the indictment are material statements." *Id.* at 509. The Supreme Court found this to be error, given that the constitutional requirements of due process and a jury trial "require criminal convictions to rest upon a jury determination that the defendant is guilty of *every element of the crime* with which he is charged, beyond a reasonable doubt." *Id.* at

28

510 (emphasis added). Thus, the Court held that the defendant was deprived of his right to jury trial, a structural error of the most basic sort.

The error here was the same. As in the cases cited, this Court does not review for plain error because the error was structural, and thus reversal is required. *See, e.g., United States v. Hamilton*, 391 F.3d 1066, 1071 (9th Cir. 2004); *United States v. Sanchez-Cervantes*, 282 F.3d 664, 670 (9th Cir. 2002) ("A structural error is one that necessarily renders a trial fundamentally unfair and therefore invalidates the conviction. We only review for plain error or assess whether an error is harmless when the error is not structural"); *see also Sullivan v. Louisiana*, 508 U.S. 275, 280 (1993) (noting that directed verdicts against defendants amount to structural error); *Rose v. Clark*, 478 U.S. 570, 578 (1986) ("harmless error analysis presumably would not apply if a court directed a verdict for the prosecution in a criminal trial by jury").

## II.

## THE WIRE FRAUD CONVICTIONS SHOULD BE REVERSED BECAUSE THE GOVERNMENT PROCEEDED ON A LEGALLY INVALID CONCEALMENT OR OMISSION THEORY.

### A.  Introduction And Standards Of Review

Appellants' convictions for wire fraud, 18 U.S.C. §1343, should

29

be reversed because the government relied on a legally invalid concealment or omission theory of fraud, which required showing that appellants had a fiduciary or trust relationship with the CD purchasers who were the alleged victims of the fraud.  This issue is reviewed *de novo*.  *See United States v. Laurienti*, __ F.3d __, 2010 WL 2473573, at *4 (9th Cir. June 16, 2010).

### B.  The Wire Fraud Convictions Should Be Reversed Because The Government Proceeded On A Legally Invalid Concealment Or OmissionTheory

The wire fraud counts alleged that appellants devised a scheme to defraud "to obtain money and property by means of false and fraudulent pretenses, representations, or promises . . . ."  JAER 51.  When setting out the elements for wire fraud, the district court confirmed that the jury was required to find that appellants made "false promises."  JAER 19.  The district court defined that phrase:

> The term "false or fraudulent pretenses, representations or promises" includes actual, direct false statements as well as half-truths, and *includes the knowing concealment of facts that are material or important to the matter in question* and that were made or used with the intent to defraud.

JAER 21.  Shortly thereafter, the district court instructed the jurors that they could find an "intent to defraud" based on things "knowingly omitted."  JAER 22.  Thus, the district court instructed the jurors that appellants were

guilty if they failed to disclose facts that the CD purchasers might have considered "material or important."

Moreover, in closing arguments, the government contended that appellants concealed important information from purchasers of the CDs. For example, the government made much of the nature of Mr. Sumeru's Ph.D., arguing Mr. Sumeru should have revealed it was a doctorate of philosophy from the Universal Life Church. The government also argued that Mr. Hall should have disclosed the exact nature of his investment experience, and that he no longer "used" his "securities license." Later the government asserted that Mr. Sumeru should have revealed a minor criminal conviction he suffered in the 1970s, and for which he paid a minimal fine. Relatedly, the government claimed Mr. Sumeru should have revealed the details of what he submitted to the Grenadian government to obtain an offshore banking license for Sattva Bank. In the midst of this portion of his argument, government counsel specifically referred to Mr. Sumeru's "omissions of material fact." Finally, the government seemed to suggest Messrs. Sumeru and Hall were to be faulted for not disclosing something about their relationship with FIBG, and their own financial dealings with FIBG. In short, the government repeatedly relied on claims of concealment

31

or omission. *See* RT 52, 57, 62-64, 97 (Sep. 16, 2008).

Though the government relied on a concealment theory, there was no evidence at trial or instructions to the jury about whether appellants had a fiduciary duty to the purchasers of the CDs. This was a fatal failure, because "a non-disclosure can only serve as the basis for a fraudulent scheme when there exists an independent duty that has been breached by the person so charged." *United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984), *rev'd on other grounds*, 473 U.S. 207 (1985). "Absent an independent duty . . . failure to disclose cannot be the basis of a fraudulent scheme." *Calif. Architectural Building Prod., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir. 1987); *see also United States v. Owens*, 335 F.3d 993, 1001 (9th Cir. 2003) (same); *United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986) (same). Such a duty may be based on a fiduciary duty, or an explicit statutory duty. *See Dowling*, 739 F.2d at 1449.

This Court recently reaffirmed the requirement of a fiduciary duty or a trust relationship in order to support a concealment or omission theory of fraud in *United States v. Laurienti*, __ F.3d __, 2010 WL 2473573, at *6-7 (9th Cir. June 16, 2010). This Court also held that it is error for a district court to fail to give a "trust relationship" jury instruction when the

government proceeds on a concealment or omission theory of fraud, *id.* at *10, and no such instruction was given in this case. In short, under a long line of precedent culminating in *Laurienti*, the wire fraud convictions in this case were based on a legally invalid theory.

This Court's decision in *Laurienti* also demonstrates why reversal of the wire fraud convictions is required, even if the government also argued that appellants made false statements, as opposed to just omissions. In *Laurienti*, this Court noted that "the government offered evidence of Defendants' failure to disclose [information] not only as circumstantial evidence of their agreement to join and carry out the conspiracy but also as an independent violation of [the applicable securities fraud statute]." *Id.* at *5. This Court therefore concluded that because a concealment "theory indisputably was one of the government's theories of guilt, Defendants' challenge to that theory must be addressed, even though the government did not *have to* advance that theory of guilt and even though the government also presented *other* theories of guilt." *Id.* at *5 (emphases in original).

These observations in *Laurienti* are based on the principle that when the government proceeds on multiple theories of liability, one of

33

which is legally invalid, reversal is required when the jury returns a general verdict. *See, e.g.*, *United States v. Barona*, 56 F.3d 1087, 1096-98 (9th Cir. 1995) (citing *Griffin v. United States*, 502 U.S. 46 (1991) and *Yates v. United States*, 354 U.S. 298 (1957)). In this case, the jury returned a general verdict, as the verdict does not specify whether or not it was based on the legally invalid concealment theory. Thus, reversal of the wire fraud counts is required. *See United States v. Joseph*, 542 F.3d 13, 19 and n.5 (2d Cir. 2008); *United States v. Fuchs*, 218 F.3d 957, 962-63 (9th Cir. 2000); *Barona*, 56 F.3d at 1097-98.

### III.

### REVERSIBLE ERROR IN MISSTATING THE LAW IN GIVING THE "DELIBERATE AVOIDANCE" JURY INSTRUCTION AND BY GIVING THE "DELIBERATE AVOIDANCE" INSTRUCTION IN THE ABSENCE OF THE EVIDENTIARY PREDICATE.

#### A. Standard of Review

A jury instruction, challenged on grounds that it contains a misstatement of law, is reviewed *de novo*. *Voohries-Larson v. Cessna Aircraft Co.*, 241 F.3d 707, 713 (9th Cir. 2001). This Court reviews the legal sufficiency of jury instructions de novo. *United States v. Romo-Romo*, 246 F.3d 1272, 1274 (9th Cir. 2001).

34

This Court reviews "whether or not the instructions taken as a whole were misleading or represented a statement inadequate to guide the jury's deliberations." *United States v. Kessi*, 868 F.2d 1097, 1101 (9th Cir. 1989).

"The adequacy of a judge's instructions to the jury is measured by reading the instructions as a whole. The judge's formulation of those instructions or his choice of language is entirely in his discretion, so long as the instructions fairly and adequately cover the issues presented." *United States v. Smith*, 735 F.2d 1196, 1198 (9th Cir. 1984).

Any omission or misstatement of an element of an offense in the jury instructions is constitutional error and, therefore, requires reversal unless the Court finds the error "harmless beyond a reasonable doubt." *United States v. Moreland,* 604 F.3d 1058, 1077 (9th Cir. 2010)(citing *United States v. Kilbride*, 584 F.3d 1240, 1247 (9th Cir. 2009) . In the absence of a timely objection to the jury instruction, this Court reviews for plain error. Plain error review requires a finding that there exists (1) an error that is (2) plain and (3) it affects substantial rights. Even if these conditions were met, this Court only exercises its discretion to correct the error if it seriously affects the fairness, integrity or public reputation of

35

judicial proceedings." *United States v. Kilbride*, 584 F.3d 1240, 1247 (9th Cir. 2009).

      **B.**     **The Court's Oral Replacement of *"high possibility"* for *"high  probability"* Detrimentally Affected The Jury's Deliberations.**

In instructing the jury, the reporter's transcript reflects that the court gave a "deliberate avoidance instruction." It stated, " [y]ou may find that a defendant acted knowingly if you find beyond a reasonable doubt that the defendant was aware of a *high possibility* that the representations made about Sattva Bank were false and he deliberately avoided learning the truth." RT 9/16/2008,8:50 a.m - 1:37 p.m: 33). The court spoke "*high possibility*" where it should have said "*high probability*."

"Possible" is defined as "that can be in the future; that may or may not happen." "Probable" is defined as "reasonably so, as on the basis of evidence, but not proved." *Webster New World Dictionary*, Third College Edition.

There is no way to determine post-trial the impact of the district court's erroneously spoken jury instruction. The definitions of "possibility" and "probability" are significantly important in the deliberate determination of whether appellants knew that SATTVA and FIBG were fraudulent ponzi

36

schemes. If the jury deliberated fraudulent knowledge based on what "may or may not be" rather than what was "reasonably so" then appellants were convicted based on a legal standard different from "beyond a reasonable doubt."

The error was plain at the time the instruction was given as the settled jury instruction required an advisement of "probability" not "possibility." An error prejudices the substantial rights of HALL and SUMERU when it affects the outcome of the trial. *United States v. Fuch*s, 218 F.3d 957, 962 (9th Cir. 2000). The Appellants submit that there is a high probability that a verdict that rests on the 'possibility' rather than the 'probability' of Appellants' learning of the falsity of representations made by FIBG which they then made about SATTVA nullifies the constitutional burden of proof to convict. Therefore, this error substantially affected the jury verdict because an inference of culpable knowledge under this instruction is only valid when the probability of deliberate avoidance is considered.

Under these circumstances, the misstatement by the court was a plain error that affected the substantial rights of HALL and SUMERU.

### C. The Deliberate Avoidance Jury Instruction Was

37

**Unsupported by the Evidence of The Case and Giving It
Constituted Reversible Error.**

"A conscious avoidance instruction permits a jury to find that a
defendant had culpable knowledge of a fact when the evidence shows that
the defendant intentionally avoided confirming the fact." (Citation omitted).
"That is to say, the instruction permits a finding of knowledge even where
there is no evidence that the defendant possessed actual knowledge.  But it
may only be given if (1) the defendant asserts the lack of some *specific
aspect* of knowledge required for conviction, . . . and (2) the appropriate
factual predicate for the charge exists, i.e. 'the evidence is such that a
rational juror may reach the conclusion beyond a reasonable doubt . . . . that
the defendant was aware of a *high probability* of the *fact in dispute* and
consciously avoided confirming that fact. Unless these two requirements are
satisfied, the instruction should not be given.  But an erroneously given
conscious avoidance instruction constitutes harmless error if the jury was
charged on actual knowledge and there was 'overwhelming evidence' to
support a finding that the defendant instead possessed actual knowledge of
the fact at issue."  *United States v. Ferrarini*, 219 F.3d 145, 154 (2nd Cir.
2000).

"To act 'knowingly' . . . is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question. When such awareness is present, 'positive' knowledge is not required." *United States v. Jewell*, 532 F.2d 697, 700 (9th Cir.)(en banc), *cert. denied*, 426 U.S. 951 (1976). The premise of the *Jewell* instruction is that a defendant cannot insulate himself from criminal liability "by consciously preserving a lack of actual knowledge of the criminal activity." *United States v. Sanchez-Robles*, 927 F.2d 1070, 1073 (9th 1991). To prevent a conviction on a theory that a defendant negligence - "that a defendant *should have known* his conduct was illegal"- the courts have cautioned that a deliberate avoidance instruction should be given sparingly. See *United States v. Garzon*, 688 F.2d 607, 609 (9th Cir. 1982).

The deliberate avoidance is generally upheld where given the circumstances a "reasonable person would have inquired extensively into the nature of the propose venture . . unless, of course, he did not want to hear the answers." *United States v. Nicholson*, 677 F.2d 706 (9th Cir. 1982). In *Nicholson*, the defendant invested $20,000 cash in an unspecified deal with someone he knew was a drug smuggler. He was given no

39

documentation of the deal and later, on one hour's notice, received a return of $10,000 in a brown paper bag. *Id*., at 707-708.

In giving this instruction, the court did not refer to appellants' assertion of his lack "of some specific aspect of knowledge" as required as a condition precedent to giving such an instruction. It is clear that this instruction can only be given to establish "culpable knowledge of a fact" not to establish a defendant's general knowledge. This instruction should only be given where appellants denied a "specific fact" or circumstance in order to establish his culpable knowledge of that fact.

This Court has warned that a "*Jewell* instruction is not appropriate where the only evidence alerting a defendant to the high probability of criminal activity is direct evidence of the illegality itself. A *Jewell* instruction should not be given when the evidence is that the defendant had either actual knowledge or no knowledge at all of the facts in question." *Jewell*, supra, at 698-699.

The court below instructed that "the defendant was aware of a high possibility that the representations made about Sattva Bank were false and he deliberately avoided learning the truth." (RT 9/16/2008, 8:50 a.m - 1:37p.m.:33). The case herein is more closely akin to *Garzon,* supra, rather

40

than *Jewell*. *Garzon* was convicted for possession of cocaine with intent to

distribute and conspiracy to distribute cocaine. Garzon's co-defendant

unknowingly met with an Drug Enforcement Agency (DEA) informant to

arrange the sell of cocaine. The co-defendant told the informant that he

knew a seller. According to the testimony of both the informant and one of

the DEA agents, the next day Garzon and his father negotiated the sale of

cocaine. Garzon denied that he knew the contents of the bag when he

opened the bag and showed it to the agents. A deliberate avoidance

instruction was error in *Garzon* because, as the Court reasoned, Garzon

either knew the content was cocaine or not. He had no reason to be

suspicious by the look of the contents of the bag if he did not recognize it

looked like cocaine.

This Court's statement in *Sanchez-Robles* is applicable to this

case because the evidence in HALL's and SUMERU's case, "points, either

directly or circumstantially, only to actual knowledge or illegality, not to

deliberate ignorance." *Sanchez-Robles*, supra, 1075.

The government presented no evidence that HALL and

SUMERU took steps to avoid learning of the fraudulent scheme of FIBG

and its sub-banks. To the contrary, the evidence directly demonstrated that

41

Appellants were pro-active by conducting due diligence. The government's theory is that HALL and SUMERU were aware that FIBG represented high returns on the CDs. Mr. Wide testified that FIBG did sell debentures to legitimate institutions. Under these circumstances, HALL and SUMERU either knew or did not know of the fraud. Nothing suggests evidence of attempts to escape learning about attendant fraud.

Without reference to specific facts to satisfy the first prong, the second prong cannot be satisfied, i.e., that appellants were "aware of a *high probability* of the fact in dispute and consciously avoided confirming that fact." See *Ferrarini*, supra, 154. Here appellants did not deny that FIBG represented high returns on investment, nor did they enter into the sub-bank activity without undertaking a due diligence investigation.

An improperly given *Jewell* instruction requires reversal unless it was "logically harmless . . . beyond a reasonable doubt." *United States v. Beckett*, 724 F.2d 855, 856 (9th Cir. 1984). The Court should not substitute its judgment for that of the jury. *Sanchez-Robles*, supra, at 1075. It is for a properly instructed jury to determine whether the circumstantial evidence of actual knowledge warrants a conviction. Because it cannot be objectively said that the evidence was so overwhelming as to compel a guilty verdict,

42

*Sanchez-Robles*, supra, at 1075, the instruction cannot be said to have been harmless beyond a reasonable doubt.

## IV.

### THE EVIDENCE WAS INSUFFICIENT TO SUPPORT HALL'S SECURITIES FRAUD AND WIRE FRAUD CONVICTIONS.

#### A. Standard of Review

Claims of insufficient evidence are reviewed *de novo*. *United States v. Moreland*, 604 F.3d 1058, 1079 (9th Cir. 2010)(citing *United States v. Shipsey*, 363 F.3d 962, 971 n.8 (9th Cir. 2004). Sufficient evidence exists to support Appellant's conviction in the court below if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Glasser v. United States*, 315 U.S. 60 (1942). Also see, *United States v. Diaz-Cardenas*, 351 F.3d 404, 407 (9th Cir. 2003); *United States v. Plache*, 913 F.2d 1375, 1381 (9th Cir. 1990).

The Due Process Clause of the *Fifth Amendment* to the United States Constitution requires that the government prove beyond a reasonable doubt every element of the crime with which a person is charged. *In re*

43

*Winship*, 397 U.S. 358, 365 (1970).

HALL argued for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure Rule 29 when the government rested and at the conclusion of the defense case; the district court judge denied their motion. (RT (partial RT 9/10/08, 1:114p.m. to 1:31p.m; 2:00 p.m. to 4:44 p.m.: 62-63; RT 9-16-2008, pg. 20; 22). A district court's ruling on a motion for judgment of acquittal is reviewed *de novo*. *United States v. Peters*, 277 F.3d 963, 976 (7th Cir. 2002).

### B. Because the Certificates of Deposit Were Not Securities the Securities Fraud Conviction Was Based on Insufficient Evidence.

The nature of an instrument is determined at the time of issuance not at a subsequent time. *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1255 (9th Cir. 1976).

It is unrefuted that in 1996, the Grenadian government promulgated the Grenadian Offshore Banking Act in order to attract foreign investment to Granada. (RT 9/8/2008:123-124; 154-155). Both FIBG and SATTVA were legally created in Grenada under the Grenadian Offshore Banking Act and subject to the Grenadian government's banking regulations at that time and when the certificates of deposits were issued and at all times

prior to the revocation of SATTVA's banking license as a sub-bank. When the CDs were issued by SATTVA and FIBG , the CDs were not securities and thus not subject to the securities laws of the United States.

The  convictions of HALL were premised on securities laws violations of the United States.  Because the CDs were not securities his convictions were based on insufficient evidence and must therefore be vacated.

### C.  If The Certificates of Deposits Are Deemed Securities and Subject to the Securities Laws of the United States, the Evidence Remains Insufficient to Find that HALL Had the Requisite Fraudulent Knowledge and Intent to Sustain His Securities Fraud and Wire Fraud Conviction.

To prove the mens rea for securities fraud, the prosecution must prove beyond a reasonable doubt that HALL intended to deceive the investors; a mere false statement is not enough.   Because HALL was convicted for securities and wire fraud, his knowledge and intent to defraud are relevant to each count on which he was convicted.

On review, not only is the evidence to be viewed in the light most favorable to the government but  all "permissible inferences" must be drawn in favor of the government.  However, where a fact to be proven is also an element of the offense, such as knowledge and intent which can be

established by inferences, "it is not enough that the inferences in the government's favor are permissible, " but the inferences must be "sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." See *United States v. Martinez*, 54 F.3d 1040, 1043 (2nd Cir. 1995, as amended May 17, 1995); *United States v. Soto*, 47 F.3d 546, 549 (2nd Cir. 1994). "A defendant may be convicted of committing securities fraud only if the government proves specific intent to defraud, mislead, or deceive," *United States v. Tarallo*, 380 F.3d 1174, 1181 (9th Cir. 2004).

### 1. Facts Relevant to HALL's Activities Associated With SATTVA.

While working at Telegroup, a company unrelated to the charges in the indictment, SUMERU's telephone number a randomly selected phone number that HALL was given to call. They struck up a conversation, and thereafter, SUMERU sent HALL a packets and then invited HALL to an Investors International program. (RT 9/15/2008:47). SUMERU used to send HALL a lot of literature some relating to high-yield investment programs and some to environmental programs in which SUMERU was involved. (RT 9/15/2008:49). HALL did not know anything about the Quantum Gold

Program in which SUMERU was previously involved. (RT 9/15/2008:50.

According to the testimony of HALL, he learned about investment opportunities in Grenada from a realtor in his town. In February 1999, after learning of the investment opportunity, HALL attended a seminar in Grenada. It was there where HALL met Van Brink of FIBG. Van Brink already had some sub-banks but he was forming more. Attending a seminar in Grenada that was supported by the presence of the Grenadian Minister of Finance Michael Creft, as well as by lawyers and accounts, HALL learned that FIBG was forming sub-banks. HALL learned that Van Brink, the chairman of the board of FIBG, maintained total control of not only FIBG but also the sub-banks.. (RT 9/15/2008:10, 13). The majority of SATTVA's investors attended the same seminars as HALL and SUMERU. (RT 9/15/2008:27, 59).

Van Brink represented at the seminar that he had had another bank named Fidelity Investment Bank in Nauru. HALL undertook a due diligence investigation with various investors and through his research learned that Van Brink had been operating FIBG more than four years and over that period of time he had been paying out returns on investors' accounts. HALL also learned that the Grenadian Finance Minister and the

47

whole Grenadian government supported Van Brink.   Because HALL had been a commodities broker trading futures for two years, he had witnessed large returns and believed in the kind of returns Van Brink represented.  (RT 9/15/2008:12). As part of HALL's due diligence, he inspected the physical premises of FIBG and discovered that it had between 50-75 employees. (RT 9/15/2008:14).

At the February 1999 seminar, HALL met Doug Ferguson, the person in charge of IDIC,  and he represented that the bank deposits were insured through IDIC.  From all objective standards , HALL concluded that FIBG was a legitimate financial institution. (RT 9/15/2008:13-14).

FIBG set up banking software for the sub-banks and gave the sub-banks access only to paper documents.  The sub-bank never handled money, the administration and monetary management was under the exclusive control of FIBG.  (RT 9/15/2008:11).

HALL testified that SATTVA's investors' deposits never went directly to SATTVA but to FIBG. The funds were assigned to SATTVA's account from which SATTVA could request their clients' withdrawals.  At first their clients' withdrawals were easily made, later the withdrawals became more difficult and ultimately FIBG completely stopped processing

withdrawal requests. (RT 9/15/2008:25-28). Prior to the cessation, all withdrawal requests had to be approved by Sandra Hollis, the Grenadian representative for FIBG, and her supervisor, Charmaine Antoine. After their approval, the requests were sent for higher-level approval, to either Rita Rigale, the CFO of FIBG or to Van Brink. (RT 9/15/2008:25-28).

HALL did not earn an extraordinary salary, approximately $105,000 over an eight-month period. (RT 9/15/2008:28-29).

SAATVA modeled its brochure on the promotional brochure and packet of FIBG as depicted in Defense Exhibit 510. Hall received it from Larry Barnabe of Granite Registry Services linked to FIBG. As a sub-bank, SATTVA was instructed by Barnabe to use the documents of defense exhibit 510 as their template in creating material for SATTVA. SUMERU, in fact, used defense exhibit 510 as his model in developing SATTVA's promotional brochure. (RT 9/15/2008: 15-16, 18- 25-28; 44).

As a options on futures broker, HALL had seen returns higher than 200% returns in the futures market. (RT 9/15/2008:51). HALL had thirty years' experience in various disciplines of the investment industry, including real estate investment, and with the Real Wealth Institute which, among other activities, assisted people in investing in the stock market (RT

49

9/15/2008:55).

According to HALL, Barnabe handled the licensing of the sub-banks. HALL obtained a police report on himself from the Fairfield Police Department, and submitted it to Barnabe.(RT 9/15/2008:63).

When SATTVA encountered impediments in obtaining withdrawal approvals for their investors in the Spring of 1999, HALL stopped soliciting potential investors. HALL does not know whether SUMERU stopped solicitation. (RT 9/15/2008:76).

> **2. No Evidence Supports a Finding That HALL Knew of Fraud Associated With FIBG and its Sub-Banks or Harbored a Fraudulent Intent to Defraud the Investors.**

A defendant may be convicted of committing securities fraud only after the government has met its burden of proof beyond a reasonable doubt that defendant had the specific intent to defraud, mislead, or deceive. *United States v. Brown*, 578 F.2d 1280, 1284 (9th Cir. 1978). The intent to defraud means that a defendant knowingly made a material misrepresentation or knowingly omitted a material fact and the misrepresentation or omission was made for the purpose of inducing the victim of the fraud to part with property that he would not otherwise have done absent the misrepresentation or omission. See *United States v. Desantis*, 134 F.3d 760, 764 (6th Cir.

50

1998).

HALL's due diligence failed to uncover suspicions to conclude that FIBG was a scam. (RT 9/15/2008:12). Likewise, Mr. Wide, the Grenadian liquidator/investigator recognized that despite the due diligence performed by the Grenadian officials, no red flags appeared to raise suspicion to FIBG's fraudulent scheme. Wide acknowledged that FIBG bought and sold debentures to apparently legitimate institutions.(RT 9/9/2008:79).

"Participation in furtherance of a fraudulent scheme does not, by itself, justify a conviction unless the defendant's knowledge of the fraudulent purpose can be shown." *United States v. Lothian*, 976 F.2d 1257, 1267 (9th Cir. 1992). There is sufficient testimony to conclude that HALL, relying on the information he received through his due diligence of FIBG, unknowingly participated in SATTVA as FIBG's fraudulent instrumentality.

The government presented no direct evidence that HALL knew that FIBG was a fraud or that HALL participated in SATTVA knowing that it was an fraudulent instrumentality of FIBG. The government relies, in part, on HALL's representations of high returns on FIBG's issued CDs and guarantees of depositors' capital made by IDIC.

51

Grenadian officials attended the seminars in Grenada, and ostensibly heard the presentations, including that relating to the IDIC protections known as the "weasel clause." If the fraud attendant to the operations of FIBG were easily discoverable through due diligence certainly the Grenadian Minister of Finance would have known of it. The fraud escaped the Grenadian officials as well, who, presumably have far more investigative resources than were available to HALL and SUMERU.

A reasonable investor or a new sub-bank director would expect that any information that was contrary to the banking laws and regulations of Grenada would be clarified by the government official. The presence of the Grenadian officials at the investment seminars engendered confidence in the attendees in FIBG. No other purpose was served by their attendance. Therefore, when HALL and SUMERU attended one of the information seminars along with other potential investors, their interest was as free of fraudulent suspicions as the other future investors.

The due diligence performed by HALL was sufficient. HALL can neither be said to have been negligent in his due diligence nor in his reliance on the legitimacy of FIBG that had been conducting business under the auspices of the Grenadian banking regulators for over four years or on

52

the investors with whom he spoke who had been receiving returns on their FIBG investments.

The government introduced no evidence to refute HALL's testimony of his term as a commodities brokers and/or his knowledge of trading options on futures. Nor did it produce evidence that HALL spoke of high returns without any risk. Nor did the government produce evidence that challenged the credibility of HALL's lack of knowledge of fraud associated with IDIC . Moreover, either the Grenadian Minister of Finance and officials shared complicity with FIBG and IDIC or were equally deceived. The government made no suggestions of what more HALL might have done in terms of due diligence to have ferreted out knowledge that FIBG and its sub-banks were a scam.

### 3. The Representation of High Returns Is Insufficient to Conclude that HALL Intended to Defraud Depositors.

The government's theory that HALL knew of the fraud and harbored a fraudulent intent rested, in part, on the representation of high-yield returns on the CDs issued by FIBG. The government's attorney stated in her closing argument, "[h]e [HALL] talked about being a commodities broker for a couple of years and then something about humanitarian causes

and stocks and stuff like that." (RT 9-16-2008, 8:50 a.m. to 1:37 p.m.: 56).

However, high investment returns would not cause HALL to be suspicions

from his experience as a commodities trading familiar with the high returns

possible from futures trading.

### a. Uncontroverted Testimony of HALL

The general rule is that "positive testimony as to a particular fact,

uncontradicted by anyone, should control the decision of the court. . ." The

United States Supreme Court recognized that exceptions apply where the

testimony is inconsistent, or contains omissions or when the witness's

demeanor raises doubt about the witness' sincerity. *Quock Ting v. United*

*States*, 140 U.S. 417, 420-21 (1891); *Guy v. City of San Diego*, 2010 U.S.

App. LEXIS 12405, *4 (9th Cir. June 17, 2010).

HALL testified that he was familiar with the type of returns

possible with options and futures trades from his years working as a

commodities broker.(RT 9/15/2008:55). No evidence was presented by the

government relative to the commodities industries about which this aspect of

HALL's testimony related. HALL's testimony in this respect was not

refuted. None of the stated *Quock* exceptions - inconsistent testimony,

omissions or his demeanor - raised doubt about HALL's commodity

experience.

The United States Supreme Court has held that negligence is an insufficient basis for securities fraud liability because a defendant's negligence does not establish the requisite knowledge under the fraud statutes. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976). Also see, *United States v. Schaflander*, 719 F.2d 1024, 1027 (9th Cir. 1983). The court in *United States v. Prince*, 214 F.3d 740 (6th Cir. 2000) also acknowledged that "a showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge." *Prince*, Id., 761(citing *United States v. Hoffman*, 918 F.2d 44, 46-47 (6th Cir. 1990).

### 4. HALL Was Required to Follow the Rules Implemented by Van Brink for FIBG in the Daily Operation of SATTVA.

Mr. Wide, the Grenadian-appointed liquidator, investigated the money trail of funds deposited into FIBG from the marketing of its CDs by SATTVA. He testified that the sub-banks, such as SATTVA, were developed by FIBG to operate under the umbrella of FIBG. (RT 9/9/2008:110). All the sub-banks were obligated, as testified by both HALL and WIDE, to operate through FIBG and according to its rules. (RT 9/9/2008:110). Mr. Wide testified that the sub-banks were like a kind of

55

franchise, operating as dictated by FIBG and selling FIBG's CDs. (RT 9/9/2008:110). SATTVA was one of these sub-banks operating under the total direction and following the rules of FIBG. According the Mr. Wide, SATTVA was merely operated by HALL and SUMERU. (RT 9/9/2008:111).

According to Wide's investigation, HALL and SUMERU had no involvement in setting up the International Deposit Insurance Corporation nor was HALL involved in setting up the Offshore Educational Institute that provided independent seminars on offshore investing. Neither HALL nor SUMERU had any hand in opening or starting Granite Registry Services that was set up to incorporate international business corporations through which investments could be made. HALL and SUMERU had no involvement in founding FIBG. (RT 9/9/2008:112-114).

According to the government's evidence, SUMERU submitted documentation for the establishment of SATTVA BANK as a sub-bank of FIBG. The evidence is clear that HALL was not involved in the submission of documents other than what HALL gave Barnabe. Moreover, the records of the Grenada International Finances Services Authority (GIFSA) reflect that SUMERU submitted all documentation and was the sole director of

56

SAATVA although, for all practical purposes, HALL was represented as a director of SATTVA to its depositors.

Where HALL merely implemented rules of FIBG in operating SATTVA, fraudulent knowledge cannot be ascribed to him in the absence of incriminating evidence. The evidence presented by the government as described hereinabove, is consistent with innocence.

For the reasons stated above, the district court's denial of HALL's motion for a judgement of acquittal constituted reversal error.

### D. There is Insufficient Evidence to Sustain HALL's Conviction of Wire Fraud.

The wire fraud statutes, 18 U.S.C. § 1343, requires proof of "any scheme or artifice to defraud." The elements of wire fraud are (1) proof of a scheme to defraud; (2) using the mails or wires to further the fraudulent scheme; and (3) specific intent to defraud . *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008). *United States v. Manion*, 339 F.3d 1153, 1156 (9th Cir. 2003); *United States v. Munoz*, 233 F.3d. 1117, 1129 (9th Cir. 2000).

Both the wire fraud statute (section 1343) and the mail fraud statute (section 1341) proscribe the use of the mails or wire communications "for the purpose of executing" a scheme to defraud, the two sections are

given similar construction. *United States vs. Cusino*, 694 F.2d 185 (9th Cir. 1982)(citing *United States v. Tarnopol*, 561 F.2d 466, 475 (3rd Cir. 1977).

In this Circuit, it is "not necessary that the defendant be the mastermind of the operation" to sustain a conviction under the wire fraud statute; however, "it is necessary to show willful participation in a scheme with knowledge of its fraudulent nature and with intent that these illicit objectives be achieved." *Manion*, supra, at 1156, citing, *United States v. Price*, 623 F.2d 587, 591 (9th Cir. 1980).

One uses the mails in furtherance of the scheme when he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonablely be foreseen, event though not actually intended." *Pereira v. United States*, 347 U.S. 1, 8-9 (1954). All "knowing participants" in the scheme are legally liable for that use of the mails." *United States v. Lothian*, 976 F.2d 1257, 1263 (9th Cir. 1992); *United States v. Dadanian*, 818 F.2d 1443, 1446 (9th Cir. 1987), modified, 856 F.2d 1391 (1988).

Counts 9 through 7, 9 through 12, and, 14 through 16 were premised on HALL's conviction on the securities fraud counts. As argued hereinabove, the evidence is insufficient to sustain a finding that HALL

knew of the fraudulent objective of SATTVA as a sub-bank of FIBG, and that he acted wilfully with the intent to execute the fraudulent purpose of securities fraud. Because the securities fraud and the wire fraud statutes are similarly constructed, where the evidence is insufficient to affirm HALL's securities conviction, hence, the same evidence is insufficient to support his wire fraud conviction.

It was reversible error for the district court to deny the motion for a judgment of acquittal on the securities fraud and wire fraud and, consequently, the conviction on those counts should be vacated.

## V.

## MR. SUMERU'S MONEY LAUNDERING CONSPIRACY CONVICTION SHOULD BE REVERSED.

### A. Introduction And Standards Of Review

In Count 18, Mr. Sumeru was convicted of conspiracy to launder money, in violation of 18 U.S.C. §1956(h). JAER 53-56. That conviction should be reversed for three reasons. First, the government failed to show Mr. Sumeru agreed to launder *profits* (rather than merely transferring receipts) of the alleged securities and wire fraud. Relatedly, the district court failed to give an appropriate instruction requiring the government to prove

that Mr. Sumeru agreed to transfer *profits* of securities and wire fraud, rather than merely agreeing to transfer receipts thereof. Second, the money laundering conviction must be reversed because the underlying securities and wire fraud convictions are defective, as argued earlier in this brief. Third, the district court erred by failing to instruct the jury that Mr. Sumeru was required to know that the laundered funds were derived from securities and wire fraud, and by giving a general "knowingly" instruction that was contrary to the knowledge required for money laundering.

The sufficiency of the evidence aspects of this argument are reviewed *de novo*. *See, e.g.*, *United States v. Van Alstyne*, 584 F.3d 803, 812 (9th Cir. 2009). The instructional issues, for which there was no objection in the trial court, are reviewed for plain error. *See, e.g.*, *United States v. Moreland*, 604 F.3d 1058, 1077-78 (9th Cir. 2010).

> **B.  Because The Government Did Not Establish That Mr. Sumeru Agreed To Launder The *Profits* Of Securities And Wire Fraud, There Was Insufficient Evidence To Convict For The Money Laundering Conspiracy; Relatedly, The Jury Was Not Properly Instructed As To This Required Showing**

The alleged objects of the money laundering conspiracy were two substantive money laundering offenses, set out in § 1956 (a)(1)(B)(I) and

60

(a)(2)(B)(I). Both prohibit engaging in financial transactions (and the like) designed to conceal attributes of the funds involved, while "knowing" the funds involved are "proceeds" of "specified unlawful activity." According to the indictment, Mr. Sumeru obtained the funds conspired to be laundered "through his involvement with Sattva," and the specified unlawful activity was "securities and wire fraud." JAER 53-54.

Describing the alleged conspiracy, the indictment claimed that in "an attempt to conceal the nature and source of funds he received from Sattva and FIBG," Mr. Sumeru had co-conspirators transfer such "funds" to his foreign and Hawaiian bank accounts. *See* JAER 55 (emphasis added). Mr. Sumeru then allegedly used ATM cards and credit cards that were "funded" by "proceeds he obtained from FIBG and Sattva." *Id.*

During trial, the government's theory was that the money laundering conspiracy was established by Mr. Hall sending money from Grenada to Mr. Sumeru's Hawaiian and foreign bank accounts. The government argued this established that there must have been some agreement that amounted to a conspiracy to launder money.[7] That is the

---

[7] Strangely, Mr. Hall was not charged in this count, which makes one wonder if the government did not shift its conspiracy theory at some point.

61

theory the government pressed during closing:

> Count 18 charges the defendant, Mr. Sumeru, with money laundering and conspiracy. Mr. Sumeru lived in Santa Barbara at the time, which was in the Central District of California -- or is in the Central District of California. Mr. Sumeru went through all sorts of convoluted means to get his money out of Sattva, out of Grenada. Rather than simply set up a U.S. bank under his own name and have the money sent there, he would have Mr. Hall send money to Mr. Sumeru's offshore accounts in Belize, Bahamas, or his account in Hawaii, under the name Sat Yuka, one of his d/b/a's. And then he would use ATMs and credit cards to get the money out of those accounts in an attempt to make it untraceable.

RT 69-70 (Sep. 16, 2008).

In *United States v. Santos*, 128 S. Ct. 2020 (2008), the Supreme Court assessed whether "proceeds," as used in §1956, applies to laundering the "receipts" of the "specified unlawful activity" charged, or only the "profits." In the context of that case, the Court held that "proceeds" meant profits, but the broader holding was unclear because the Court issued three opinions, with a 4-1-4 split in votes.[8]

Clarity arrived with *United States v. Van Alstyne*, 584 F.3d 803

---

[8]     Notably, 18 U.S.C. §1956 was amended after *Santos* was decided, such that "proceeds" now includes "gross receipts." Because this case is based on the version of the statue at issue in *Santos*, the holding in that case controls. *See United States v. Van Alstyne*, 584 F.3d 803, 814 n. 12 (9th Cir. 2009).

(9th Cir. 2009), which held that "[o]nly the desire the avoid the 'merger problem' united the five justices who held Santos' payments . . . did not constitute money laundering. . . . We therefore view the holding that commanded five votes in *Santos* as being that 'proceeds' means 'profits' where viewing 'proceeds' as 'receipts' would present a 'merger' problem of the kind that troubled the plurality and concurrence in *Santos*." *Id.* at 814.

Before turning to *Van Alstyne*'s application of that holding, it is necessary to explain the "merger problem" identified in *Santos*. In the *Santos* plurality opinion, Justice Scalia explained that problem in the context of that case (which charged money laundering of illegal lottery proceeds), and generally. With respect to the former, Justice Scalia wrote:

> If "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. §1955, would "merge" with the money-laundering statute. Congress evidently decided that lottery operators ordinarily deserve up to 5 years of imprisonment, §1955(a), but as a result of merger they would face an additional 20 years, §1956(a)(1). Prosecutors, of course, would acquire the discretion to charge the lesser lottery offense, the greater money-laundering offense, or both - which would predictably be used to induce a plea bargain to the lesser charge.

*Santos*, 128 S. Ct. at 2026. Addressing the merger problem more generally,

Justice Scalia wrote:

> The merger problem is not limited to lottery operators. For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime. Few crimes are entirely free of cost, and costs are not always paid in advance. Anyone who pays for the costs of a crime with its proceeds - for example, the felon who uses the stolen money to pay for the rented getaway car - would violate the money-laundering statute. And any wealth-acquiring crime with multiple participants would become money-laundering when the initial recipient of the wealth gives his confederates their shares. Generally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else, would merge with money laundering.

*Id.* at 2026-27. Justice Scalia concluded:

> The government suggests no explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the sentence for that crime. Interpreting "proceeds" to mean "profits" eliminates the merger problem.

*Id.* at 2027.

As noted above, after discerning the larger holding of *Santos*, this

Court in *Van Alstyne* applied the holding to the facts of that case, which

involved charges of mail fraud, 18 U.S.C. §1341, and laundering the alleged

"proceeds." The Court began by holding that "mail fraud, is, or can be, a crime presenting the 'merger problem.'" 584 F.3d at 814. The Court then found Van Alstyne's issuing "distribution checks" to victims of his financial fraud could not also be charged as money laundering because those transactions were "a central component of the [mail fraud] 'scheme to defraud.'" *See id.* at 815. Hence, the merger problem arose: allowing the government to proceed on a receipts definition would mean mailing distribution checks would be a component of both the mail fraud and money laundering offenses.

*Van Alstyne* went on to note that while not all "mail fraud schemes will involve payments that could implicate the 'merger' problem," the "'profits' definition of proceeds should apply where the particular crime at issue depends on necessary payments, as it does here." *Id.* Such "necessary payments" include "when multiple participants share profits [from a wealth-acquiring crime], regardless of whether the predicate crime would overlap with money laundering if executed by a single criminal." *Id.*

In light of *Van Alstyne*, it is apparent that combining wire and securities "scheme to defraud" charges with money laundering charges "can" raise a "merger problem." Accordingly, the holding of *Van Alstyne* is

generally applicable. More important, applying that holding to this case shows there was insufficient evidence to convict for conspiracy to launder money.

As an initial matter, the government introduced no evidence to establish that there was an agreement to launder the "profits" of the alleged securities and mail fraud schemes. As indicated in its closing argument, to establish the money laundering conspiracy the government relied on Mr. Hall transferring funds to Mr. Sumeru. This shows nothing with respect to whether those funds were profits from the alleged fraud, rather than "necessary payments" to carry on the fraud.[9] Of course, the government's showing says even less with respect to whether Mr. Sumeru agreed to launder "profits" of the alleged scheme.

In addition, *Van Alstyne* and *Santos* indicate any profit paid from one schemer to another can never form the basis of a money laundering count, because such payments are necessary to a scheme to defraud involving more than one person. As Justice Scalia wrote in *Santos*, there is

---

[9] Notably, as part of the securities and wire frauds alleged, the government claimed the defendants issued the same sorts of "distribution checks" found lacking in *Van Alstyne*. *See* 584 F.3d at 815; JAER 49, 51 (indictment paragraph 38 and paragraph 1 of wire fraud incorporating earlier paragraphs).

66

"no explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the sentence for that crime." 128 S. Ct. at 2027; *see also Van Alstyne*, 584 F.3d at 815. Given this logic, even if the subject transfers from Mr. Hall to Mr. Sumeru had been profits of the scheme(s) to defraud, the merger problem would prohibit their being charged as independent money laundering counts. That conclusion is consistent with this Court's holding that to qualify as criminally derived "proceeds" under money laundering statutes, funds must come "from prior, separate criminal activity." *United States v. Savage*, 67 F.3d 1435, 1442 (9th Cir. 1995) (emphasis added); *see also United States v. Estacio*, 64 F.3d 477, 480-81 (9th Cir. 1995) (same). Accordingly, the evidence was insufficient to convict for Count 18, and judgment of acquittal should have been granted. *See Van Alstyne*, 584 F.3d at 812-13, 815.

Finally, if this Court disagrees with Mr. Sumeru's sufficiency argument, it should at least reverse and remand for a new trial on Count 18 because the jury was given defective money laundering instructions. In *United States v. Moreland*, 604 F.3d 1058, 1077-78 (9th Cir. 2010), this Court reviewed under a plain error standard, applied *Santos* and *Van Alstyne*,

67

and held reversal was appropriate due to the jury instructions' failure to define "proceeds" as "profits." The jury instructions were similarly flawed in this case, and therefore the same result is warranted here.

### C. The Money Laundering Conviction Must Be Reversed Because The Underlying Securities And Wire Fraud Convictions Are Defective

The indictment charged that the "specified unlawful activity" underlying the money laundering charge was the alleged securities and wire fraud. *See* JAER 54. As argued earlier in this brief, the underlying securities and wire fraud convictions are invalid. As a result, Mr. Sumeru's money laundering conviction must also be set aside. *See United States v. Bala*, 489 F.3d 334, 342 (8th Cir. 2007).

### D. The District Court Committed Plain Error By Failing To Instruct That Mr. Sumeru Must Have The Requisite Intent To Commit Money Laundering, And By Giving A General "Knowingly" Instruction

When instructing the jury on Count 18, the district court first set out the statutory text of §1956(a)(1)(B)(I) and (a)(2)(B)(I), which were the alleged objects of the conspiracy. The district court then told the jury that to convict the government must show: (1) "there was an agreement between two or more persons to commit money laundering in violation of" those two

68

statutory provisions; and (2) Mr. Sumeru became a member of that conspiracy "knowing of at least one of its objects and intending to help accomplish it." JAER 25. The district court also told the jurors, "You must find that there was a plan to commit at least one of the [money laundering] crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit." JAER 25-26.

"To convict on a federal conspiracy charge, the government must prove . . . the requisite intent necessary to commit the underlying offense." *United States v. Freeman*, 498 F.3d 893, 907 (9th Cir. 2007). The underlying offenses here were the substantive money laundering provisions charged as objects of the conspiracy, sections 1956(a)(1)(B)(I) and (a)(2)(B)(I). Those substantive offenses require the government to show the funds sought to be laundered were proceeds of specified unlawful activity. *See, e.g., United States v. Deeb*, 175 F.3d 1163, 1167 (9th Cir. 1999); Ninth Cir. Model Jury Instr. 8.121; Ninth Cir. Model Jury Instr. 8.123.

Thus, the district court should have instructed the jurors that they were required to find Mr. Sumeru knew the funds he allegedly agreed to

launder were profits from securities and wire fraud.[10]  That element was completely lacking from the instructions.

Moreover, this Court long ago held that a district court should not give a general "knowingly" instruction in cases charging money laundering, because a conviction for money laundering requires that the "defendant must have known that the primary predicate activity [in this case, securities and wire fraud] was unlawful."  *See United States v. Stein*, 37 F.3d 1407, 1410 (9th Cir. 1994).  Despite this, the district court gave a general "knowingly" instruction, stating:

> An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident.  *The government is not required to prove that defendants knew their acts or omissions were unlawful*.  You may consider evidence of a defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.  However, with respect to Count 18, the government must prove the defendant Sumeru had *knowledge of the conspiracy*.

ER 20 (emphasis added).  Although the final sentence of the instruction appeared to demonstrate some recognition of the error addressed by this

---

[10]   Notably, the district court was required to instruct the jury on the elements of the offenses charged as objects of the conspiracy.  *See United States v. Alghazouli*, 517 F.3d 1179, 1189 (9th Cir. 2008).  Instead, the district court read the statutory text.  *See* ER 24.

70

Court in *Stein*, 37 F.3d at 1410, it did not avert that error. Instead, the instructions merely told the jurors they must find Mr. Sumeru knew about the conspiracy, not that they must find he agreed to launder money he knew was the proceeds of wire and securities fraud.

Reversal is required under the plain error test set out in *United States v. Olano*, 507 U.S. 725 (1993). Under that test, "[a] trial court commits plain error when (1) there is error, (2) that is plain, and (3) the error affects substantial rights." *United States v. Fuchs*, 218 F.3d 957, 962 (9th Cir. 2000). A court will exercise its discretion to remedy such error "if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

As for the first two prongs of the *Olano* test, there was plain error, as a trial "court's failure to charge a necessary element of the offense generally is plain error." *United States v. Warren*, 984 F.2d 325, 327 (9th Cir. 1993). Indeed, the error here was plain, given that the error was, and is, clear under current law. *See Moreland*, 604 F.3d at 1077 (9th Cir. 2010) (error is plain if it is clear at time of appeal); *United States v. Perez*, 116 F.3d 840, 846 (9th Cir. 1997) (*en banc*).

As for the third prong of *Olano*, "[i]t is a basic tenet of due

71

process that a criminal defendant's conviction must rest upon a jury's finding beyond a reasonable doubt that he is guilty of each element of the crime charged." *United States v. Alferahin*, 433 F.3d 1148, 1157 (9th Cir. 2006). Accordingly, "[a] defendant's substantial rights are unquestionably implicated when his purported conviction rests on anything less than a finding of guilt as to the elements of the crime." *Id.* at 1157; *see also United States v. Bear*, 439 F.3d 565, 570 (9th Cir. 2006) (finding third prong satisfied for instructional error); *United States v. Burt*, 143 F.3d 1215, 1218 (9th Cir. 1998) (same).

Finally, the Court should exercise its discretion to correct the error because the various arguments above demonstrate that it is problematic to conclude that Mr. Sumeru knew that the funds involved were *profits* of securities and wire fraud. *See Bear*, 439 F.3d at 570 (exercising court's discretion to remedy plain error even where government's evidence was strong); *Burt*, 143 F.3d at 1219. Accordingly, the Court should exercise its discretion to reverse the conviction on Count 18.

## VI.

## MR. SUMERU'S CONVICTIONS FOR FAILURE TO FILE TAX RETURNS SHOULD BE REVERSED.

72

## A.  Introduction And Standard Of Review

In Counts 19 and 20 of the indictment, Mr. Sumeru was convicted for failure to file tax returns.  JAER 57-58.  For those counts, the district court erroneously instructed the jury with respect to the required mental state of willfulness.  Although counsel for Mr. Sumeru failed to object to that instruction, thereby triggering plain error review under the *Olano* standard, reversal of the tax counts is nevertheless required.

## B.  The Tax Instructions Were Plainly Erroneous

Mr. Sumeru was charged with "[f]ailure to file" a tax return, in violation of 26 U.S.C. §7203.  Section 7203 is titled, "*Willful* failure to file return, supply information, or pay tax."  (Emphasis added.)  The statute prohibits "*willfully* fail[ing] to . . . make such return . . . at the time or times required by law or regulations . . . ."  Consistent with this, Counts 19 and 20 charged that Mr. Sumeru "*willfully* fail[ed] to make an income tax return . . . ."  JAER 57 (emphasis added).

When instructing on the elements of §7203, the district court correctly stated that the government was required to show Mr. Sumeru "willfully failed to file an income tax return . . . ."  JAER 27.  However, when defining "willfully" the district court said "[a]n act is done willfully if

73

it is done knowingly and intentionally, not through ignorance or mistake."

JAER 18.

The district court's willfulness instruction was erroneous, because it said nothing about Mr. Sumeru's knowledge of his duty to file a tax return, nor that he intentionally and voluntarily violated that duty. Nearly twenty years ago, the Supreme Court noted the longstanding, special *men rea* requirements in tax cases, and reiterated the definition of willfulness applicable to §7203:

> Willfulness, as construed by our prior decisions in criminal tax cases, requires the government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty.

*Cheek v. United States*, 498 U.S. 192, 200-201 (1991); *see also United States v. Powell*, 955 F.2d 1206, 1210 (9th Cir. 1992) (noting correct jury instruction based on *Cheek*). While the model Ninth Circuit criminal jury instructions do not provide a specific instruction for willfulness, they point to the correct definition for tax cases, and cite *Cheek*. *See* Ninth Cir. Model Crim. Jury Instr. 5.5.

The plainness of the error here was similar in nature to the erroneous "knowingly" instruction given for the money laundering offense.

74

It was plain based on longstanding law. *See Perez*, 116 F.3d at 846. Thus, the first and second prongs of the plain error test are satisfied.

### C. Reversal Is Required

Reversal is also required under the third and fourth plain error prongs. As for the third prong, a "defendant's substantial rights are unquestionably implicated when his purported conviction rests on anything less than a finding of guilt as to the elements of the crime." *Alferahin*, 433 F.3d at 1157; *see also Bear*, 439 F.3d at 570; *Burt*, 143 F.3d at 1218. This case is also similar to *United States v. Thomas*, 459 F.2d 1172 (D.C. Cir. 1972), where the court concluded that "even though 'willfulness was mentioned in the indictment and in the statute as read to the jury, and was generally defined, it was essential that the court go further and specifically include 'willfulness' in its evil mind connotation as an essential element of the offense charged. Failure to do this constituted plain error warranting reversal." *Id.* at 1177.

Finally, the Court should exercise its discretion to correct the error because the issue of whether Mr. Sumeru acted willfully was the key issue for these charges. Moreover, the evidence of willfulness was scant to non-existent, thereby supporting reversal under the fourth prong. *See Bear*,

75

439 F.3d at 570; *Burt*, 143 F.3d at 1219. In fact, the only evidence the government introduced on this point was a 1990 letter Mr. Sumeru wrote to the IRS, in which he apologized for his wife's late filing of her 1988 tax return. In that letter, Mr. Sumeru wrote that the filing was late because of a misunderstanding with his wife, and because he thought that due to losses she did not need to file. This hardly establishes that Mr. Sumeru intentionally violated a known duty to file *his* 1999 and 2000 tax returns.

Accordingly, because the error was plain, and affected Mr. Sumeru's rights with respect to an element on which the government's evidence was thin, the Court should exercise its discretion to reverse Counts 19 and 20.

## VII.

## REVERSIBLE ERROR IN DENYING HALL'S SEVERANCE MOTION

### A. Standard of Review

A denial to sever a defendant's trial from a co-defendant's is reviewed for an *abuse of discretion*. *United States v. Hanley*, 190 F.3d 1017, 1026-1028 (9th Cir. 1999).

### B. HALL Was Unduly Prejudiced by the Joint Trial

76

On August 11, 2008, HALL filed his motion to sever the trials.
He argued that he would be unduly prejudiced by the antagonistic defenses
of HALL and SUMERU resulting in the denial of his right to a fair trial. (CR
221; JAER 95).

A district court should grant severance "only if there is a serious
risk that a joint trial would compromise a specific trial right or one of the
defendants, or prevent the jury from making a reliable judgment about guilty
or innocence." *United States v. Angwin*, 271 F.3d 786. 795 (9th Cir.
2001)(quoting *Zafiro v. United States*, 506 U.S. 534, 538 (1993).

The test for an abuse of discretion by the district court is
"whether the joint trial was so manifestly prejudicial as to require the trial
judge to exercise his discretion in but one way, by ordering a separate trial."
*United States v. Abushi*, 682 F.2d 1289, 1296 (9th Cir. 1982).

Rule 14 provides that, at the discretion of the trial judge, a
severance may be ordered when it appears that a defendant may be
significantly prejudiced by a joint trial with is co-defendants. *Fed. R. of
Crim. P.* Rule 14. The party seeking reversal of the decision denying the
severance under Rule 14 bears the burden of establishing that the undue
prejudice occasioned by the joint trial must also show a violation of one of

77

his substantive rights such as the court's failure to properly instruct the jury on the admissibility of evidence as to each defendant which implicates HALL's right to a fair trial. *United States v. Camacho*, 528 F.2d 464, 470 (9th Cir), cert. denied, 429 U.S. 995,(1976); *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir. 1980).

The government's essential prosecutorial strategy was simply that the actions of one implicated the other.  For example, the government attorney stated, in referring to Exhibit 2, the founding newsletter of SATTVA, that "the defendants sent [it] out to hundreds of people. . ."   Yet none of the witnesses stated that HALL had sent them a newsletter but that SUMERU had.  (RT 9/16/2008:48).  The government also stated that the jury should look at the "promotional materials that *they* [HALL and SUMERU] sent out to people in order to lure them into their little trap." (RT 9/16/2008:49).   Exhibit 3, a notebook of SUMERU's , was the subject of the government's comment that  "they [HALL and SUMERU]  put [it] together and sent out. . ."  (RT 9/16/2008:50).  Again, there was no evidence that HALL had created, written, assembled, or mailed  any information appearing in  Exhibit 3.

Government witness Gregory Klein testified that over a one-and-

78

a-half year period he worked for SUMERU and they became friends.

(RT9/9/2008:123,173). At SUMERU's direction, according to Klein, in

about June 1999, Klein mailed information about SATTVA to 680 of

SUMERU's friends. Klein continued these mailings of information packets

to people interested in SATTVA until April 2000. (RT9/9/2008:140-141).

Mr. Blakemore, another government witness who testified relative to Exhibit

3, was unable to say from whom he received a copy of government exhibit 3.

He stated, "You know, it's been so long I don't recall whether that came in

the mail or whether I was given it personally." (RT 9/8/2008:50).

The Indictment charged both HALL and SUMERU with

securities fraud and wire fraud by alleging similar conduct against both. For

example, the government charged them with offering CDs for sale with

guaranteed high rate of return, representing that the CDs were insured by the

International Deposit Reinsurance Corporation (IDIC), and that the conduct

of HALL and SUMERU was part of the scheme and artifice to defraud.

(CR 297; JAER 39-42).

Because the government equated the two as "co-schemers"

(Indictment p. 6), it is unlikely that the jury could compartmentalize the

evidence as it related to each defendant. See *United States v. Escalante*,

79

supra, at 1201.

### C. The Prejudice Suffered By HALL Was Not Cured By Jury Instructions.

Although the prejudicial effect of evidence relating to the guilt of co-defendants in joint trials is generally considered capable of being neutralized by careful jury instructions, this was not the case in the trial below. The spill-over effect of SUMERU's actions onto HALL was noticeable.

During the closing arguments, the government repeatedly attributed some of the actions of SUMERU to "they." When HALL objected, the district court gave no limiting instruction. (RT 9/16/2009:50).

The importance of the district court judge's intervention in giving limiting instructions that clearly alert the jury to "its obligation to compartmentalize the evidence" to protect defendants' due process rights has been squarely recognized in this Circuit. *United States v. Polizzi*, 801 F.2d 1543, 1554 (9th Cir. 1986). A defendant's due process protection is more assured when the district court thoroughly instructs the jury to "give 'separate, personal consideration . . . to each individual defendant' and 'analyze what the evidence . . . shows with respect to that individual, leaving

80

out of consideration entirely any evidence admitted solely against' the other defendant, and that 'each defendant is entitled to have his case determined from evidence as to his own acts or statements or conduct." *Polizzi*, supra, 1554.

Clearly, in HALL's case below, the jury was not adequately instructed to protect against the spill-over that the government continuously made. The district court judge's instruction was not sufficiently clear to alert the jury to its obligation to compartmentalize its deliberations. The court below instructed as follows:

> "A separate crime is charged against one or more of the defendants in each count. The charges have been joined for trial. You must decide the case of each defendant on each crime against that defendant separately. Your verdict on any count as to any defendant should not control your verdict on any other count or as to any other defendant. All of the instructions apply to each defendant and to each count, unless a specific instruction states that it applies only to a specific defendant."

(RT 9/08/2008, 8:50am. -1:37p.m.:41).

SUMERU and HALL were directors of the same bank yet had different functions at SATTVA. HALL was not present at all of the seminars with SUMERU. HALL and SUMERU were indicted on securities fraud and wire fraud charges that alleged the same conduct against both

81

appellants arising out of their participation in SATTVA .  Under this set of facts, it was critical that HALL's actions be segregated from those of SUMERU to prevent the jury from ultimately lumping both together.

The jury instruction as given, only alerted the jury that it had to return separate verdicts, one for SUMERU and one for HALL.  The abbreviated instruction did not produce the level of assurance consistent with the Due Process Clause mandate - that the jury deliberate HALL's guilt or innocence within the standard of *In Re Winship*, supra.

The jury instruction did not effectively neutralize the district court's error in denying the motion for severance.  The injurious prejudicial consequence to HALL is that  the government was relieved from its burden of proving each fact necessary against HALL separate from SUMERU to establish beyond a reasonable doubt each element of the crimes charged against HALL.

Because it was easier for the jury to follow the path of the government, in the absence of an adequate jury instruction, and fuse their deliberation of HALL's guilt or innocence with SUMERU's conduct, the undue prejudice suffered by HALL by compromising his right to a fair trial should not be overlooked by this Court.  The infringement of  HALL's  right

82

to a fair trial by the denial of his motion to sever the defendants' trials was exacerbated by an inadequate jury instruction. Therefore, HALL's conviction should be reversed.

## CONCLUSION

For the foregoing reasons, this Court should reverse appellants' convictions and remand for entries of judgments of acquittal and for a new trial.

Respectfully submitted,

*s/Benjamin L. Coleman, Gretchen Fusilier*

Dated: July 29, 2010

**BENJAMIN L. COLEMAN**
**COLEMAN & BALOGH LLP**
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: (619) 794-0420

Attorneys for Mr. Sumeru

**GRETCHEN FUSILIER**
**ATTORNEY AT LAW**
P.O. Box 305
Carlsbad, California 92018
Telephone: (760) 728-5958

Attorney for Mr. Hall

## <u>CERTIFICATE OF RELATED CASES</u>

Counsel is unaware of any related cases.

Respectfully submitted,

*s/Benjamin L. Coleman, Gretchen Fusilier*

Dated: July 29, 2010      **COLEMAN & BALOGH LLP**
**BENJAMIN L. COLEMAN**
1350 Columbia Street, Suite 600
San Diego, California  92101
Telephone:  (619) 794-0420

Attorneys for Mr. Sumeru

**GRETCHEN FUSILIER**
**ATTORNEY AT LAW**
P.O. Box 305
Carlsbad, California 92018
Telephone: (760) 728-5958

Attorney for Mr. Hall

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1,

the attached Opening/~~Answering/Reply~~ Brief is:

Proportionately spaced, has a typeface of 14 points or more, and
contains 17,174 words and 101 pages.


Date: July 29, 2010          <u>*s/Benjamin L. Coleman, Gretchen Fusilier*</u>
                             BENJAMIN L. COLEMAN
                             GRETCHEN FUSILIER

## **CERTIFICATE OF SERVICE**

I, hereby certify that on July 29, 2010, I electronically filed the

foregoing opening brief with the Clerk of the Court for the United States

Court of Appeals for the Ninth Circuit by using the appellate CM/ECF

system.

I certify that all participants in the case are registered CM/ECF users

and that service will be accomplished by the appellate CM/ECF system.

Dated: July 29, 2010

*s/Benjamin L. Coleman, Gretchen Fusilier*
BENJAMIN L. COLEMAN
GRETCHEN FUSILIER
